**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PAULINA POE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>U.S. DEPARTMENT OF JUSTICE; TAMMIE M. GREGG, in her official capacity as Principal Deputy Director, Bureau of Justice Assistance; and TODD BLANCHE, in his official capacity as Acting Attorney General of the United States,<br><br>　　　Defendants. | Case No. 1:26-cv-01552<br><br>**COMPLAINT** |

## NATURE OF THE ACTION

1.     Congress unanimously passed the Prison Rape Elimination Act ("PREA"), 34 U.S.C. §§ 30301–30309, in 2003 to "establish a zero-tolerance standard" for prison rape in the United States. 34 U.S.C. § 30302(1). By enacting this legislation, Congress sent a clear message: In our criminal justice system, rape should never be part of someone's punishment.

2.     In 2012, at Congress's direction and after nine years of research and notice-and-comment rulemaking, the U.S. Department of Justice ("DOJ") promulgated regulations establishing national standards to prevent, detect, and respond to sexual abuse in correctional facilities. *See* National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106 (June 20, 2012) (codified at 28 C.F.R. pt. 115) ("PREA regulations").

3.     Transgender people in United States prisons and jails face staggering rates of sexual abuse. DOJ knew this when it was developing the PREA regulations. Consequently, to protect transgender people from sexual violence while incarcerated, DOJ promulgated several regulations designed to address their extreme risks and individual vulnerabilities. Those binding regulations are the law.

4.     Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, duly promulgated regulations cannot be rescinded without notice-and-comment rulemaking.

5.     On January 20, 2025, the President issued Executive Order 14168 (the "Gender Ideology Order"), which announced a broad federal policy to deny legal recognition and equal rights to transgender people. The Gender Ideology Order expressly directed DOJ to amend the PREA regulations as necessary to implement this discriminatory policy against transgender incarcerated people.

6.     DOJ has not amended the PREA regulations as directed by the Gender Ideology Order. Instead, on December 2, 2025, DOJ issued a memorandum titled "National PREA

1

Standards Alignment with Executive Order 14168" (the "Memorandum") unilaterally suspending, "effective immediately," all PREA regulations that reference transgender people. A true and correct copy of the Memorandum is attached to this Complaint as **Exhibit 1**.

7.      Under the Memorandum, state and federal correctional facilities are no longer required to comply with PREA regulations relating to transgender, intersex, and gender non-conforming individuals. *Id.* at 1–2. PREA auditors are prohibited from even asking about compliance and must "advise" correctional facilities to "disregard" those regulations. *Id.* at 2–3.

8.      The Memorandum transparently explained that, in the face of a direct "conflict" between the Gender Ideology Order and the PREA regulations, DOJ decided to "align" with the President's policy preferences rather than follow the law. *See id.* at 1–2. But an executive order is not a license to disregard binding regulations or to unilaterally rescind them without the public notice and comment required by the APA.

9.      The Memorandum puts transgender, intersex, and gender non-conforming incarcerated people at a heightened risk of sexual abuse and contravenes Congress's fundamental purposes in enacting PREA.

10.     Plaintiff brings this action to hold Defendants accountable for their brazen violation of the rule of law. Plaintiff asks this Court to hold unlawful and set aside the Memorandum as procedurally invalid.

**<u>JURISDICTION AND VENUE</u>**

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331. Plaintiff asserts procedural claims under the APA, 5 U.S.C. § 702.

12.     Exhaustion is not required under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), because an administrative remedy does not exist.  There is no prison grievance procedure that can vacate the Memorandum, require DOJ to conform its PREA-related policies

2

to binding regulations, or govern the conduct of a PREA auditor in the facility where Plaintiff is incarcerated.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities.

## PARTIES

14.    Plaintiff Paulina Poe is an incarcerated transgender woman.

15.    Defendant DOJ is an agency of the United States government under 5 U.S.C. § 551.

16.    Defendant Tammie M. Gregg is Principal Deputy Director of the Bureau of Justice Assistance, which is part of DOJ. She is sued in her official capacity.

17.    Defendant Todd Blanche is the Acting Attorney General of the United States. He is sued in his official capacity.

## FACTUAL BACKGROUND

**A.    *The PREA Regulations Were Informed by PREA's Statutory Purposes, a Comprehensive Report with Recommendations from the National Prison Rape Elimination Commission, and Extensive Public Comment***

18.    PREA's statutory purposes are, among other things, to "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States," "make the prevention of prison rape a top priority in each prison system," and "develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30302(1)–(3).

19.    To accomplish these statutory objectives, Congress established the National Prison Rape Elimination Commission (the "Commission"). 34 U.S.C. § 30306(a). Congress directed the bipartisan Commission to comprehensively study sexual abuse in prisons and

3

"recommend[] national standards for enhancing the detection, prevention, reduction, and punishment of prison rape." *Id.* § 30306(b), (d), (e)(1).

20.    In 2009, after more than five years of research, the Commission published its findings and recommendations. *See* Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Commission Report* (June 2009), available at https://perma.cc/3RGD-UQZU. The Commission's report emphasized that "every correctional agency must have a written policy mandating zero tolerance for all forms of sexual abuse in all settings," *id.* at 5, and stressed that screening incarcerated individuals to identify those potentially susceptible to sexual abuse was a key component of preventing it, *id.* at 8.

21.    After analyzing the available research and data, the Commission determined that transgender people face a significant risk of sexual abuse in prison. *Id.* at 73. In particular, the report emphasized that transgender women in men's facilities are at "extremely high risk for abuse" due to their "obvious gender nonconformity." *Id.* at 74. Consequently, the Commission determined that "decisive steps" were necessary to protect transgender people from prison rape, *id.* at 8, and recommended several national standards specific to this population, *see id.* at 3–24.

22.    After receiving the Commission's report and recommendations, DOJ began developing regulations to implement PREA, as Congress commanded. 34 U.S.C. § 30307(a)(1).

23.    On March 10, 2010, DOJ published an Advance Notice of Proposed Rulemaking ("ANPRM") titled "National Standards to Prevent, Detect, and Respond to Prison Rape." 75 Fed. Reg. 11077 (Mar. 10, 2010).

24.    DOJ issued the ANPRM to "solicit public input on the Commission's proposed national standards and to receive information useful to [DOJ] in publishing a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape, as

4

mandated by PREA." *Id.* The ANPRM opened a two-month public comment period that closed on May 10, 2010. *Id.*

25. Approximately a year later, DOJ published a Notice of Proposed Rulemaking to establish national standards under PREA. *See* National Standards to Prevent, Detect, and Respond to Prison Rape, 76 Fed. Reg. 6248 (Feb. 3, 2011). The proposed regulations contained multiple provisions designed to identify and protect transgender incarcerated people from sexual abuse. *See id.* More than 1,300 public comments were submitted on the proposed regulations. *See* Nat'l Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106 (June 20, 2012).

26. In response, DOJ "carefully reviewed each comment and deliberated internally on the revisions that the commenters proposed," and in 2012 promulgated the final rule setting national standards under PREA. *Id.* The final national standards were codified at 28 C.F.R. pt. 115.

> **B.** ***The PREA Regulations Contain Several Provisions Designed Specifically to Protect Transgender, Intersex, and Gender Non-conforming People from Sexual Abuse***

27. The PREA regulations include multiple specific provisions to protect incarcerated transgender persons from sexual abuse.

28. Starting with intake: The PREA regulations require correctional facilities to screen all incarcerated people to evaluate their risk of sexual victimization. 28 C.F.R. §§ 115.41, 115.241, 115.341. Transgender, intersex, or gender non-conforming status are specific risk factors that must be assessed. *Id.* §§ 115.41(d)(7), 115.241(d)(7), 115.341(c)(2).

29. Facilities must use this risk assessment to make individualized determinations regarding "housing, bed, work, education, and program assignments" with the goal of protecting

5

incarcerated people—including transgender, intersex, and gender non-conforming people—from sexual abuse. *Id.* §§ 115.42(a)–(b), 115.242(a)–(b); *see also id.* § 115.342(a), (d).

30.    The PREA regulations also require facilities to make a "case-by-case" decision about whether to assign a transgender or intersex person to a male or female facility, considering the individual's health and safety and any management or security problems that may arise in connection with the placement. *Id.* §§ 115.42(c), 115.242(c), 115.342(d).

31.    In making these placement and programming decisions, facilities must "give[] serious consideration" to a transgender or intersex person's own views on their safety. *Id.* §§ 115.42(e), 115.242(d), 115.342(f). These decisions must also "be reassessed at least twice each year to review any threats to safety experienced" by the transgender or intersex person. *Id.* §§ 115.42(d), 115.342(e).

32.    Facilities must also give transgender and intersex people "the opportunity to shower separately." *Id.* §§ 115.42(f), 115.242(e), 115.342(g).

33.    Facilities may not establish a dedicated transgender or intersex unit or otherwise segregate individuals solely based on their transgender or intersex status, absent a consent decree, legal settlement, or court judgment authorizing such placement for the purpose of protecting transgender or intersex people. *Id.* §§ 115.42(g), 115.242(f).

34.    The PREA regulations also contain provisions designed to protect transgender and intersex people from sexually abusive searches by facility staff. In addition to general restrictions on "cross-gender viewing and searches," *id.* §§ 115.15, 115.115, 115.215, 115.315, facilities may not "search or physically examine" a transgender or intersex individual "for the sole purpose of determining [their] genital status," *id.* §§ 115.15(e), 115.115(d), 115.215(e), 115.315(e). Instead, that status is to be ascertained through "conversations with the [individual], by reviewing

6

medical records, or, if necessary, by learning that information as part of a broader medical examination conducted in private by a medical practitioner." *Id.* §§ 115.15(e), 115.115(d), 115.215(e), 115.315(e).

35.    In addition, the PREA regulations require that staff be trained on conducting cross-gender pat-down searches and on searching transgender and intersex individuals "in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs." *Id.* §§ 115.15(f), 115.115(e), 115.215(f), 115.315(f).

36.    Likewise, the PREA regulations require training for employees on "effective[]" and "professional[]" communication with transgender, intersex, and gender non-conforming individuals. *Id.* §§ 115.31(a)(9), 115.231(a)(9), 115.331(a)(9).

37.    Finally, when investigating reported incidents or allegations of sexual abuse, agencies are required to consider whether the incident was motivated by, among other things, the victim's transgender or intersex status. *Id.* §§ 115.86(d)(2), 115.186(d)(2), 115.286(d)(2), 115.386(d)(2).

### C.    *Mandatory Compliance Audits Are a Cornerstone of PREA's Enforcement Scheme*

38.    The PREA regulations apply directly to federal facilities and bind state and local facilities as a condition for federal funding. *See* 34 U.S.C. § 30307(b), (e). To ensure compliance with all regulatory requirements, all facilities are subject to a mandatory audit procedure. 28 C.F.R. §§ 115.93, 115.193, 115.293, 115.393, 115.401–405.

39.    DOJ-certified auditors must make compliance determinations for each PREA regulation. *Id.* §§ 115.402, 115.403(c). They must rate facilities' compliance using the following ranking system: "Exceeds Standard (substantially exceeds requirement of standard); Meets

7

Standard (substantial compliance; complies in all material ways with the standard for the relevant review period); Does Not Meet Standard (requires corrective action)." *Id.* § 115.403(c).

40.　　In making these compliance determinations, PREA auditors must review information from a variety of sources, including documents produced by facilities. *Id.* § 115.401(f)–(g), (i). Auditors also must be allowed to conduct private interviews with incarcerated people and to communicate directly with incarcerated people through confidential correspondence. *Id.* § 115.401(m)–(n). And they must "attempt to communicate with community-based or victim advocates who may have insight into relevant conditions in the facility." *Id.* § 115.401(o).

41.　　The PREA regulations and accompanying audits have resulted in measurable improvements. For example, in 2015, only ten states were in full compliance with PREA, while in 2025, twenty-five states and the District of Columbia certified full PREA compliance.[1] Although there have been improvements, sexual violence in custody is still an entrenched problem that requires robust federal oversight.[2]

**D.　　As Part of a Targeted Reversal of Legal Equality for Transgender People, the President Ordered DOJ to Amend the PREA Regulations**

42.　　For years, the President has expressed hostile views toward transgender people. During his 2024 presidential campaign, Donald Trump pledged a "day one" executive order to "cease all programs that promote the concept of sex and gender transition at any age."[3]

---

[1]　Josephine Wonsun Hahn & Tiffany Sanabia, *Federal Funding Cuts Target Efforts to Reduce Sexual Abuse in Prisons*, Brennan Center for Justice (Jan. 26, 2026), https://www.brennancenter.org/our-work/research-reports/federal-funding-cuts-target-efforts-reduce-sexual-abuse-prisons.

[2]　*Id.*

[3]　Donald J. Trump (@realDonaldTrump), *President Trump's Plan to Protect Children from Left-Wing Gender Insanity,* Truth Social (Jan. 31, 2023, 1:07 PM), archived at Trump's Truth,

43.     Throughout the campaign, he used derogatory language to describe transgender Americans, calling them "deranged,"[4] and complaining about gender "madness"[5] and "insanity."[6] He falsely claimed transgender people were "never heard of in all of human history."[7]

44.     Groups associated with President Trump's campaign spent approximately $215 million on advertisements targeting transgender Americans and promoting anti-transgender

---

https://trumpstruth.org/statuses/17146; *see also* Andrew Stanton, *Trump Pledges Flurry of Executive Orders to Combat 'Gender Insanity,'* Newsweek (Jan. 31, 2023, 5:32 PM), https://www.newsweek.com/donald-trump-promises-executive-orders-gender-affirming-healthcare-transgender-youth-1777976.

[4]   Gabriel Bertrand, *Trump's Shocking Admission Exposes GOP's Bigoted Agenda*, Medium (June 17, 2023), https://medium.com/illumination/trumps-shocking-admission-exposes-gop-sbigoted-agenda-e981becb2c5f.

[5]   Donald J. Trump (@realDonaldTrump), *President Trump's Plan to Protect Children from Left-Wing Gender Insanity,* Truth Social (Jan. 31, 2023, 1:07 PM), archived at Trump's Truth, https://trumpstruth.org/statuses/17146.

[6]   Jackson Walker, *Trump vows to remove 'transgender insanity' and critical race theory from US schools*, Idaho News (Dec. 23, 2024, 8:37 AM), https://idahonews.com/news/nation-world/trump-vows-to-remove-transgender-insanity-and-critical-race-theory-from-us-schools-phoeniz-arizona-woke-speech-usa-donald-president-white-house-education-department-crt-trans-gender-lgbt; Bill Barrow, *Trump and Vance make anti-transgender attacks central to their campaign's closing argument*, Associated Press, Nov. 1, 2024, https://apnews.com/article/trump-harris-transgender-politics-61cff97a64fac581ffc5f762be4c57d3; Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 18, 2023, 12:57 AM), https://truthsocial.com/@realDonaldTrump/posts/111599880929254153; Joe Middleton, *Trump attacks transgender rights at Waco rally saying he will ban 'disfigurement of our youth,'* The Independent (Mar. 26, 2023, 1:30 PM), https://www.independent.co.uk/news/world/americas/donald-trump-transgender-waco-rallyb2308177.html.

[7]   Donald J. Trump (@realDonaldTrump), *President Trump's Plan to Protect Children from Left-Wing Gender Insanity,* Truth Social (Jan. 31, 2023, 1:07 PM), archived at Trump's Truth, https://trumpstruth.org/statuses/17146.

policies.[8] Of the advertisements in support of President Trump's campaign in the weeks before the 2024 election, which cost an estimated $95 million, over 40 percent were anti-transgender advertisements.[9]

45.    President Trump's campaign platform included a "Plan to Protect Children from Left-Wing Gender Insanity," which promised to deny legal recognition to transgender people and restrict access to medically necessary healthcare.[10]

46.    On December 22, 2024, President Trump affirmed his intent to implement discriminatory transgender policies through executive action, stating "with a stroke of [his] pen on day one," he would "stop the transgender lunacy" and "get transgender out of the military and out of our elementary schools and middle schools and high schools."[11]

47.    The official acts of President Trump and his administration since January 20, 2025, have consistently targeted transgender people. Federal courts have remarked that the Administration's "disapproval of the transgender community [is] well known," *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 232 (D. Mass. 2025), and emphasized "how

---

[8]    Audrey Kemp, *What Trump's win – and $215m worth of anti-trans ads – mean for the future of campaigning*, The Drum (Nov. 6, 2024), https://www.thedrum.com/news/2024/11/06/after-donald-trump-s-victory-marketers-weigh-their-role-countering-divisive.

[9]    Lauren Barrón-López et al., *Why anti-transgender political ads are dominating the airwaves this election*, PBS News (Nov. 2, 2024 5:35 PM), https://www.pbs.org/newshour/show/why-anti-transgender-political-ads-are-dominating-the-airwaves-this-election.

[10]    Donald J. Trump (@realDonaldTrump), *President Trump's Plan to Protect Children from Left-Wing Gender Insanity,* Truth Social (Jan. 31, 2023, 1:07 PM), archived at Trump's Truth, https://trumpstruth.org/statuses/17146.

[11]    Azcentral.com and The Arizona Republic, *Turning Point USA Donald Trump full speech: The 'golden age of America' begins now, says Trump*, YouTube (Dec. 23, 2024), https://www.youtube.com/watch?v=XuIeXJw6BA8, at 57:02–24.

broad the government's campaign is against transgender people," *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *3 n.3 (W.D. Pa. Dec. 24, 2025).

48.     Under the President's leadership, the federal government has undertaken a sustained effort to eliminate any reference to transgender people from federal government websites and other materials. For example, at DOJ, the Bureau of Prisons deleted statistics regarding transgender individuals in federal prisons.[12] DOJ's Bureau of Justice Statistics also removed questions about transgender people from several upcoming data collections, including the National Crime Victimization Survey, and stopped collecting information on gender as part of the Survey of Sexual Victimization, which tracks sexual abuse in adult and juvenile correctional facilities.[13]

49.     Beyond DOJ, the State Department's website that formerly provided advice for "LGBTQI Travelers" was revised to provide advice only for "Gay and Lesbian Travelers."[14] Similarly, a State Department web page providing "Resources for LGBTQI+ Prospective Adoptive Parents" was revised to provide resources only for "LGB Prospective Adoptive Parents."[15] In addition, stopbullying.gov, a website hosted by the Department of Health and

---

[12]  Amy Solomon & Betsy Pearl, *Federal Data in the Crosshairs: What's at Stake for Public Safety?*, Council on Criminal Justice (Aug. 2025), https://counciloncj.org/federal-data-in-the-crosshairs-whats-at-stake-for-public-safety/.

[13]  *Id.*

[14]  Jo Yurcaba, *Government agencies scrub LGBTQ web pages and remove info about trans and intersex people*, NBC News (Feb. 3, 2025, 6:22 PM), https://www.nbcnews.com/nbc-out/out-politics-and-policy/government-agencies-scrub-lgbtq-web-pages-remove-info-trans-intersex-p-rcna190519; *see also* Dep't of State, *Gay and Lesbian Travelers*, Travel.State.gov, https://travel.state.gov/en/international-travel/planning/personal-needs/gay-lesbian.html (last visited Mar. 31, 2026).

[15]  Jo Yurcaba, *Government agencies scrub LGBTQ web pages and remove info about trans and intersex people*, NBC News (Feb. 3, 2025, 6:22 PM), https://www.nbcnews.com/nbc-out/out-politics-and-policy/government-agencies-scrub-lgbtq-web-pages-remove-info-trans-intersex-

Human Services, removed dedicated tags that allowed visitors to search articles on the topics "LGBT Youth" and "Transgender" bullying.[16] Information related to health and healthcare for transgender people was also eliminated from federal government websites.[17] The National Park Service removed references to the word "transgender" from its webpage about the Stonewall National Monument.[18] An Army museum covered up a display honoring transgender soldiers.[19] Other examples abound.[20]

50.    The Administration has also aggressively targeted and sought to end medically necessary healthcare for transgender people. These efforts include proposing regulations that

---

p-rcna190519; *see also* Dep't of State, *Resources for LGB Prospective Adoptive Parents*, Travel.State.gov, https://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/before-you-adopt/LGB-adoption-resources.html (last visited Mar. 31, 2026).

[16]    Nico Lang, *Trump Is Purging Federal Websites of LGBTQ+ Content. Here's What's Been Affected So Far*, Them (Feb. 7, 2025), https://www.them.us/story/trump-administration-federal-websites-lgbtq-content-deleted-cdc-doe-usaid.

[17]    Carla K. Johnson, *Health data, entire pages wiped from federal websites as Trump officials target 'gender ideology,'* Associated Press, Jan. 31, 2025, https://apnews.com/article/trump-gender-ideology-sex-pronouns-order-transgender-2d7e54837f5d0651ed0cefa5ea0d6301.

[18]    Elizabeth Wolfe, *'Transgender' and 'queer' erased from Stonewall Uprising national monument website*, CNN (Feb. 13, 2025, 11:39 PM), https://www.cnn.com/2025/02/13/us/stonewall-inn-national-monument-transgender/index.html.

[19]    Michelle Del Rey, *Army museum covers display honoring transgender soldiers*, The Independent (Feb. 7, 2025, 8:12 PM), https://www.the-independent.com/news/world/americas/army-museum-transgender-soldiersb2694440.html.

[20]    *See, e.g.*, Tessa Gervasini, *Federal government scrubs transgender language from websites*, EWTN News (Feb. 4, 2025, 1:55 PM), https://www.ewtnnews.com/world/us/federal-government-scrubs-transgender-language-from-websites; Kevin Collier & Ben Goggin, *DOJ ordered review of 'gender ideology' compliance at child safety authority*, NBC News (Feb. 7, 2025, 6:48 PM), https://www.nbcnews.com/politics/donald-trump/doj-orders-child-safety-authority-comply-trumps-gender-ideology-order-rcna191282; Ethan Corey, *Trump DOJ Erases Trans People from Crime Data Surveys*, The Appeal (May 5, 2025), https://theappeal.org/trump-doj-erases-trans-people-from-crime-data-surveys/.

12

threaten Medicare, Medicaid, and Children's Health Insurance Program funding for certain

providers offering gender-transition care;[21] threatening gender-transition care providers with

exclusion from federal healthcare programs;[22] threatening funding for medical grant recipients

that provide gender-transition care;[23] prohibiting military hospitals and clinics from providing

gender-transition care to military dependents regardless of age;[24] terminating gender-transition

care in federal prisons;[25] designating transgender healthcare as an activity that can trigger

disqualification from Public Service Loan Forgiveness for healthcare employers and

employees;[26] issuing overbroad administrative subpoenas to hospitals across the country seeking

confidential patient health data and other information related to the hospitals' provision of

gender transition care;[27] and invoking consumer-protection statutes to go after medical

---

[21]  Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children, 90 Fed. Reg. 59441 (Dec. 19, 2025); Medicare and Medicaid Programs; Hospital Conditions of Participation: Prohibiting Sex-Rejecting Procedures for Children, 90 Fed. Reg. 59463 (Dec. 19, 2025).

[22]  Robert F. Kennedy Jr., Dep't of Health & Human Servs., *Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents*, Dep't of Health & Hum. Servs. (Dec. 18, 2025).

[23]  *See PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 417–18 (D. Md. 2025).

[24]  *See* Am. Compl., *Doe v. Dep't of Def.*, No. 8:25-cv-02947 (D. Md. Feb. 18, 2026).

[25]  *See* Compl., Exs. 1–2, *Kingdom v. Trump*, No. 1:25-cv-00691, 2025 WL 1568238 (D.D.C. Mar. 7, 2025); Fed. Bureau of Prisons, DOJ, Program Statement 5260.01, *Management of Inmates with Gender Dysphoria* (Feb. 19, 2026).

[26]  *See* William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 48966 (Oct. 31, 2025) (to be codified at 34 C.F.R. § 685.219).

[27]  *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 232, 239 (D. Mass. 2025). "Every court to consider [the subpoenas] agrees" that they are "a smokescreen for [the government's] true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations.'" *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, Misc. No. 25-mc-00063, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026); *see In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 237–38; *In re 2025*

13

associations, including the Endocrine Society, because of their research and work related to transgender healthcare.[28]

51.     The Administration has also effectively refused to process transgender people's complaints of employment discrimination,[29] investigated school districts for adopting policies that support and include transgender students,[30] banned transgender people from military service,[31] prohibited transgender people from obtaining accurate federal identification documents,[32] and more.

52.     This constellation of discriminatory executive actions can be traced to a series of executive orders intended to strip transgender people of legal recognition and equal rights. These executive orders contained false and inflammatory language to describe transgender people and

---

*UPMC Subpoena*, 2025 WL 3724705, at *2–3; *Queerdoc, PLLC v. U.S. DOJ*, 807 F. Supp. 3d 1295, 1303–04 (W.D. Wash. 2025); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 575–87 (E.D. Pa. 2025); *In re 2025 Subpoena to Child.'s Nat'l Hosp.*, No. 1:25-cv-03780, 2026 WL 160792, at *8–9 (D. Md. Jan. 21, 2026).

[28]   *See* Compl., *Endocrine Soc'y v. FTC*, No. 1:26-cv-00512 (D.D.C. Feb. 17, 2026).

[29]   *See, e.g.*, Claire Savage, *EEOC instructs staff to sideline all new transgender discrimination cases, employees say*, Associated Press, April 18, 2025, https://apnews.com/article/transgender-discrimination-gender-civil-rights-88def3b2a735f09cb79d37fc1125b095.

[30]   *See* Press Release, Dep't of Ed., U.S. Department of Education Launches Investigations into Four Kansas School Districts For Alleged Title IX, FERPA Violations (Aug. 14, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-investigations-four-kansas-school-districts-alleged-title-ix-ferpa-violations; Press Release, Dep't of Ed., U.S. Department of Education's Office for Civil Rights Launches Title IX Investigation into Saratoga Springs City School District (May 6, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-launches-title-ix-investigation-saratoga-springs-city-school-district.

[31]   Exec. Order No. 14183, 90 Fed. Reg. 8757 (Feb. 3, 2025).

[32]   Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025).

14

their healthcare, and they announced policies to prevent equal participation by transgender people in virtually every aspect of civil society, including with respect to federal funding, homeless shelters, prisons, employment, and international travel;[33] the military;[34] schools;[35] sports;[36] and healthcare.[37]

53.     The first of these executive orders was the Gender Ideology Order,[38] which was issued on the first day of the President's second term. That order adopted definitions of "sex," "women," "girls," "men," "boys," "female," and "male" to ensure no federal laws or policies recognize transgender people.[39]

54.     The Gender Ideology Order also contained false and denigrating statements about transgender people, including that they transition in order to "gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers," and that their existence is a "false claim" made possible by "gender ideology."[40, 41]

---

[33]   *Id.*

[34]   Exec. Order No. 14183, 90 Fed. Reg. 8757 (Feb. 3, 2025).

[35]   Exec. Order. No. 14190, 90 Fed. Reg. 8853 (Feb. 3, 2025).

[36]   Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 11, 2025).

[37]   Exec. Order. No. 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025).

[38]   Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025).

[39]   *Id.*

[40]   *Id.*

[41]   Based on this and other language, multiple courts have held that the Gender Ideology Order was motivated by animus against transgender individuals. *See Washington v. Trump*, 768 F. Supp. 3d 1239, 1277 (W.D. Wash. 2025) (holding that the Gender Ideology Order "reflects a bare desire to harm a politically unpopular group as its underlying actual purpose" (citation

15

55.    The Gender Ideology Order expressly targeted transgender people incarcerated in federal correctional facilities, ordering the Bureau of Prisons to terminate all gender transition care regardless of medical necessity and to transfer all transgender women to men's facilities regardless of sexual abuse risk.[42] In connection with these commands, the Gender Ideology Order effectively directed DOJ to rescind certain PREA regulations protecting transgender people despite the well-known and extreme risk to this population.[43]

56.    The Bureau of Prisons immediately began implementing the Gender Ideology Order, taking steps to transfer transgender women out of women's facilities and issuing a policy forbidding gender transition care in federal correctional facilities. Its efforts were repeatedly enjoined in federal court based on Eighth Amendment and APA claims.[44] The Gender Ideology Order and related policies continue to be challenged in ongoing litigation.

---

modified)); *S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1216 (N.D. Cal. 2025) (holding that the "facially discriminatory objective" to "deny[] federal funding only to grantees who recognize the existence of transgender people" in the Gender Ideology Order is "not a legitimate government interest"), *appeal docketed*, No. 25-4988 (9th Cir. filed Aug. 7, 2025).

[42]    Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025).

[43]    *Id.*

[44]    *Kingdom v. Trump*, No. 1:25-cv-691, 2025 WL 1568238, at *1 (D.D.C. June 3, 2025); *Doe v. Bondi*, No. 1:25-cv-286, 2025 WL 596653, at *1–2 (D.D.C. Feb. 18, 2025); *Jones v. Bondi*, No. 1:25-cv-401, 2025 WL 923117, at *1 (D.D.C. Feb. 24, 2025); *Jones v. Bondi*, No. 1:25-cv-401, 2025 WL 923755, at *2–3 (D.D.C. Mar. 3, 2025).

**E.    *DOJ Implemented the President's Discriminatory Policy Priorities by Unlawfully Rescinding All PREA Regulations Protecting Transgender Individuals Without Public Notice and Comment***

57.    Without following the President's directive to amend the PREA regulations, DOJ issued a memorandum addressed to all DOJ-certified PREA auditors implementing the broad policies in the Gender Ideology Order. *See* Ex. 1.

58.    The Memorandum states that "[p]ortions of the PREA Standards are in conflict" with the Gender Ideology Order. Ex. 1 at 1. The Memorandum acknowledged that the PREA regulations have not been updated to align with the Gender Ideology Order. *Id.* at 2. Yet the Memorandum stated that "***effective immediately***, applicable federal and non-federal correctional facilities ***shall not be held to subsections of the PREA Standards*** that may conflict" with the Gender Ideology Order. *Id.* (emphasis added).

59.    The Memorandum listed the PREA regulations that presented such a "conflict." *Id.* The list included every regulation that references transgender people. *See id.* It did not include any other regulation. *See id.*

60.    Under the Memorandum, PREA auditors are instructed to "advise" correctional facilities "to disregard" all PREA regulations protecting transgender people and to "refrain from uploading documentation" related to those regulations. *Id.* at 3.

61.    The Memorandum also commanded PREA auditors to "immediately pause from making compliance determinations" pertaining to the listed regulations. *Id.* at 2. This is in direct violation of 28 C.F.R. § 115.401(c), which requires PREA auditors to make a compliance determination as to "each" PREA regulation.

62.    The Memorandum also released facilities from any ongoing corrective action that had been triggered by a past failure to comply with the PREA regulations protecting transgender people. Ex. 1 at 4.

17

63.    These directives effectively rescinded the PREA regulations that a bipartisan commission and DOJ previously determined were necessary—after notice and extensive public comment—to address the extreme risks of sexual violence that transgender people face in correctional facilities every day. *See* Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Commission Report* (June 2009).

64.    Such a substantive rule change can only be legally accomplished through the notice-and-comment rulemaking process established by the APA, 5 U.S.C. § 553. The Memorandum is a blatant end-run around this mandatory process.

## F.    By Abolishing Essential PREA Protections for Transgender, Gender Non-conforming, and Intersex People, DOJ Further Endangered a Population That Already Faces Extremely High Rates of Sexual Abuse in Custody

65.    Prison officials have known for decades that transgender people face disproportionately high risks of sexual abuse in custody. U.S. government data demonstrate that from 2011 to 2012, 39.9 percent of transgender people in prison had been sexually abused or assaulted in the past year. *See* Allen J. Beck, DOJ BJS, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12* (December 2014). During the same period, just 4 percent of all adults in state and federal prisons were sexually abused or assaulted in the past year. *See id.* In other words, transgender people were sexually abused or assaulted in custody at nearly ten times the rate of the total prison population.

66.    The sexual abuse risks to transgender people are similarly disproportionate in the jail context. From 2011 to 2012, 26.8 percent of transgender people in jails had been sexually abused or assaulted in the past year, compared to just 3.2 percent of the total jail population. *See id.*

67.    Based on data collected between 2007 and 2012, the federal government found that "an estimated 35% of transgender [people] held in prisons and 34% held in local jails

18

reported experiencing one or more incidents of sexual victimization by another inmate or facility staff" annually. DOJ, Office of Justice Programs, Bureau of Justice Statistics, *PREA Data Collection Activities 2015* (June 2015), at 2. Nearly three quarters of reported incidents from transgender prisoners were sexual assaults. *Id.* (74 percent of reported victimization by other incarcerated people and 75 percent of reported victimization by staff). Most involved physical force or threats. *Id.* (72 percent of reported victimization by other incarcerated people and 51 percent of reported victimization by staff).

68.    The very high and disproportionate risk of sexual assault also exists in juvenile facilities. In 2018, transgender young people reported being sexually abused or assaulted by their peers in custody in the past year nearly nine times as often as young people who are not transgender. Michael B. Field & Elizabeth Davis, *Victim, Perpetrator, and Incident Characteristics of Sexual Victimization of Youth in Juvenile Facilities, 2018 – Statistical Tables* (November 2020), Table 1.1 (showing that 14.3 percent of transgender young people were sexually victimized by their peers in the past year, compared to 1.6 percent of young people who are not transgender).

69.    In addition to point-in-time data, non-government sources also consistently confirm that transgender and gender non-conforming people experience extraordinarily high rates of sexual violence over the course of their incarceration. An empirical study conducted in California men's prisons found that "[s]exual assault is 13 times more prevalent" for transgender incarcerated people compared to a random sample of incarcerated people. Valerie Jenness et al., *Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault* 3 (Ctr. for Evidence-Based Corrs., Univ. of Cal., Irvine, Apr. 27, 2007).

19

70.     The study found that 59 percent of transgender people had been sexually assaulted in custody, compared to 4.4 percent of a random sample of incarcerated people. *Id.* at 27. In addition, 50 percent of transgender people had been raped by force or threat of force, compared to 3.1 percent of randomly selected incarcerated people. *Id.* at 28.

71.     Three-quarters of the transgender people who experienced sexual assault had been victimized on multiple occasions. *Id.* at 29–30. One transgender person reported being sexually assaulted by thirteen other incarcerated people on three occasions. *Id.* at 37. Another described being raped every day in the shower for a year. *Id.* at 45.

72.     The study also indicated that sexual assaults were more likely to be dangerous and violent when the victim was transgender. For sexual assaults involving a weapon, the weapon was actually used against a transgender person 75 percent of the time, compared to 20 percent of the time for a randomly selected group of incarcerated people. *Id.* at 36.

73.     A more recent report found that 53 percent of transgender and gender non-conforming adults in state prisons across the United States had been sexually assaulted by another incarcerated person while serving their current sentence. Kelsie Chesnut & Jennifer Peirce, *Advancing Transgender Justice: Illuminating Trans Lives Behind and Beyond Bars* 44 (Vera Inst. of Justice, Feb. 2024).

74.     The DOJ Memorandum intensifies these already disproportionately high risks of sexual violence by effectively rescinding the PREA regulations that are intended to protect transgender, intersex, and gender non-conforming people in correctional facilities nationwide.

75.     The Memorandum has resulted in concrete, direct injuries to Plaintiff.

76.     Plaintiff is a transgender woman incarcerated in a men's facility. She is not safe living among men and is vulnerable to sexual abuse by facility staff as well as male prisoners.

20

77. For instance, Plaintiff has been repeatedly propositioned for sex by men in threatening ways. Men often touch Plaintiff's breasts without her consent. Plaintiff also endures frequent comments about her body, particularly her breasts.

78. Plaintiff has also been sexually assaulted.

79. Plaintiff has also been strip searched by male officers several times in the past two years. This experience left Plaintiff traumatized and humiliated.

80. Because of PREA-related policies, Plaintiff should only be pat-searched or strip-searched by female officers. Without PREA's protection, Plaintiff fears she will more frequently be put in dangerous situations with male officers.

81. The Memorandum effectively stripped Plaintiff of legal rights and protections established by the PREA regulations. Those rights are no longer subject to PREA's enforcement scheme, and violations carry no penalty. As a result, Plaintiff now faces an even higher risk of sexual abuse than she already faced as a transgender woman housed in a men's facility.

82. To the extent the facility where Plaintiff is housed has complied with the PREA regulations in the past, the Memorandum no longer requires them to do so. This places Plaintiff at an even higher risk of harm than she previously experienced. The Memorandum effectively rescinds specific regulations intended to protect this incredibly vulnerable population. Corrections officers could put Plaintiff at risk of sexual assault at any moment by housing her in a cell with a particularly dangerous prisoner, even inadvertently; transferring her to more dangerous housing; or forcing her to shower with male prisoners, among other things. And Plaintiff would have no recourse under the PREA regulations specifically intended to protect against these serious risks.

83.    To the extent the facility where Plaintiff is housed has violated or will violate the PREA regulations, Plaintiff has lost any opportunity to secure the facility's compliance through a PREA audit because of the Memorandum's restrictions on the scope and impact of PREA audits.

84.    The lack of effective PREA protections due to the Memorandum has caused Plaintiff to suffer increased anxiety and fear of sexual violence. Federal courts have recognized this kind of psychological trauma as a tangible, cognizable injury. In addition, while auditors would have prioritized Plaintiff for interviews in the past, auditors now have no reason to speak with Plaintiff to monitor her safety.

85.    The Memorandum has also caused Plaintiff to suffer ongoing and serious psychological and group-based harms. The Memorandum singles out transgender, intersex, and gender non-conforming individuals and strips them—and no one else—of crucial protections from sexual violence. As a transgender person directly impacted by the Memorandum, Plaintiff rightly fears she will no longer be protected or helped. This lack of protections makes Plaintiff more vulnerable to sexual assaults by men. It also strips Plaintiff of avenues for redress that were in place prior to the Memorandum's adoption.

## COUNT I
## PROCEDURAL VIOLATION OF THE APA
### (Against All Defendants in their Official Capacities)

86.    The allegations set forth in paragraphs 1 through 85 are incorporated by reference as if set forth here in full.

87.    The APA requires that substantive rules be promulgated through notice-and-comment rulemaking, with general notice published in the Federal Register to allow interested parties an opportunity to participate in the rulemaking process. 5 U.S.C. § 553.

88.    The Memorandum is final agency action within the meaning of 5 U.S.C. § 704.

22

89.     Defendant DOJ is an agency as defined by the APA. 5 U.S.C. § 551. Defendants Gregg and Blanche are sued in their official capacities as the author of the Memorandum and the Acting Attorney General responsible for enforcing the PREA regulations, respectively.

90.     The Memorandum unilaterally rescinds PREA regulations applicable to transgender individuals without the notice-and-comment rulemaking required by the APA.

91.     The Memorandum also unilaterally instructs all PREA-certified auditors to ignore and disregard duly promulgated PREA regulations applicable to transgender, intersex, and gender non-conforming individuals without notice-and-comment rulemaking as required by the APA.

92.     By issuing the Memorandum without notice-and-comment rulemaking, Defendants have violated procedural requirements of the APA. *See* 5 U.S.C. § 553.

93.     The issuance of the Memorandum has injured Plaintiff and will continue to do so.

94.     The Memorandum is unlawful and must be declared unlawful, set aside, and vacated pursuant to 5 U.S.C. § 706(2)(D).

## COUNT II
## DECLARATORY JUDGMENT
### (Against All Defendants in their Official Capacities)

95.     The allegations set forth in paragraphs 1 through 94 are incorporated by reference as if set forth here in full.

96.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration."

97.     An actual, substantial, and justiciable controversy exists between Plaintiff and Defendants concerning the legality of the Memorandum—whether Defendants can unilaterally

rescind aspects of the PREA regulations applicable to transgender individuals without notice-and-comment rulemaking in violation of the APA.

98.    Plaintiff is entitled to a declaratory judgment from this Court that the Memorandum is unlawful final agency action under the APA, and the PREA regulations at issue in the Memorandum remain in full force and effect unless and until such standards are modified in compliance with the APA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant all relief available to her by law, including but not limited to the following:

(1)  Declaring that the Memorandum is an unlawful and invalid final agency action under the APA;

(2)  Declaring that the PREA regulations at issue in the Memorandum remain in full force and effect under the APA and the Declaratory Judgment Act;

(3)  Pending final judgment, staying the implementation of the Memorandum under the APA;

(4)  Permanently enjoining enforcement of the Memorandum and requiring Defendants to disseminate a notice to all facilities subject to PREA clarifying that the Memorandum was enjoined and the PREA regulations continue to be binding;

(5)  Awarding Plaintiff costs, expenses, and reasonable attorneys' fees; and

(6)  Granting such other and further relief as the Court deems just and proper.

Dated: May 6, 2026

Respectfully submitted,

/s/ Alexander Shalom
Amy Whelan (*pro hac vice pending*)
National Center For LGBTQ Rights
1401 21st Street #11548
Sacramento, CA 95811
(415) 365-1338
awhelan@nclrights.org

Sarah Austin (*pro hac vice pending*)
GLBTQ Legal Advocates & Defenders
18 Tremont Street Suite 950
Boston, MA 02108
(617) 426-1350
saustin@glad.org

Alexander Shalom (NJ055)
Natalie Kraner (NY0304)
Kegan Brown (*pro hac vice pending*)
Amanda K. Cipriano (*pro hac vice pending*)
Mikayla R. Berliner (*pro hac vice pending*)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07960
(212) 419-5866
ashalom@lowenstein.com
nkraner@lowenstein.com
kbrown@lowenstein.com
acipriano@lowenstein.com
mberliner@lowenstein.com

Alyssa C. Lareau (D.C. Bar 494881, *admission to D.D.C. pending*)
Wardenski P.C.
300 New Jersey Avenue NW, Suite 300
Washington, DC 20001
(202) 935-4224
alyssa@wardenskilaw.com

*Attorneys for Plaintiff Paulina Poe*

25