**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PAULINA POE,<br><br>       Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE; TAMMIE M. GREGG, in her official capacity as Principal Deputy Director, Bureau of Justice Assistance; and TODD BLANCHE, in his official capacity as Acting Attorney General of the United States,<br><br>       Defendants. | Case No. 1:26-cv-01552 (DLF) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

Sarah Austin (*D.D.C. admission pending*)
**GLBTQ LEGAL ADVOCATES &**
**DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350

Amy Whelan (*D.D.C. admission pending*)
**NATIONAL CENTER FOR LGBTQ**
**RIGHTS**
1401 21st Street #11548
Sacramento, CA 95811
(415) 365-1338

Alexander Shalom (NJ055)
Natalie Kraner (NY0304)
Kegan A. Brown (admitted *pro hac vice*)
Amanda K. Cipriano (admitted *pro hac vice*)
Mikayla R. Berliner (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, NJ 07960
(212) 419-5866

Alyssa C. Lareau (D.C. Bar ID 494881)
**WARDENSKI P.C.**
300 New Jersey Avenue NW, Suite 300
Washington, D.C. 20001
(202) 935-4224

*Attorneys for Plaintiff Paulina Poe*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 2

I.    THE PRISON RAPE ELIMINATION ACT AND PREA REGULATIONS .................... 2

    A.    The National Prison Rape Elimination Commission Assessed the Risks Leading to Sexual Abuse and Found That Transgender People Were Particularly Vulnerable ......................................................................................... 2

    B.    DOJ Promulgated PREA Regulations Through Notice-and-Comment Rulemaking ......................................................................................................... 3

II.   EXECUTIVE ORDER 14168 ............................................................................................ 8

III.  DEFENDANTS' MEMORANDUM UNLAWFULLY REMOVES PREA PROTECTIONS FOR TRANSGENDER INCARCERATED PEOPLE ............................ 9

IV.   PLAINTIFF PAULINA POE ............................................................................................ 11

ARGUMENT ..................................................................................................................... 12

I.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HER PROCEDURAL APA AND DECLARATORY JUDGMENT CLAIMS ......................... 13

    A.    Defendants' Memorandum is Final Agency Action ............................................ 13

    B.    Defendants' Memorandum Violates the Procedural Requirements of the APA .................................................................................................................... 16

II.   VACATUR OF THE MEMORANDUM IS THE PROPER REMEDY ........................... 17

CONCLUSION .................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alphapointe v. Dep't of Veterans Affs.*,
475 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................................13

*Am. Hosp. Ass'n v. Dep't of Health & Hum. Servs.*,
No. 18-2112 (JDB), 2018 WL 5777397 (D.D.C. Nov. 2, 2018) ............................12

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ..................................................................................................17

*Bennett v. Spear*,
520 U.S. 154 (1997) ..................................................................................13, 15, 16

*Biden v. Texas*,
597 U.S. 785 (2022) ..................................................................................................15

*Blue Water Navy Viet. Veterans Ass'n, Inc. v. McDonald*,
830 F.3d 570 (D.C. Cir. 2016) ..................................................................................17

*Cabrera v. U.S. Dep't of Lab.*,
792 F. Supp. 3d 91 (D.D.C. 2025) ......................................................................13, 17

*Cap. Area Immigrs.' Rts. Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) ...........................................................................17

*Ciox Health, LLC v. Azar*,
435 F. Supp. 3d 30 (D.D.C. 2020) ...........................................................................14

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017) ......................................................................................15

*Daimler Trucks N. Am. LLC v. EPA*,
737 F.3d 95 (D.C. Cir. 2013) ..............................................................................17, 18

*Drs. for Am. v. Off. of Pers. Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) ......................................................................15, 16

*Drs. for Am. v. Off. of Pers. Mgmt.*,
793 F. Supp. 3d 112 (D.D.C. 2025) ..........................................................................18

*E.B. v. U.S. Dep't of State*,
583 F. Supp. 3d 58 (D.D.C. 2022) ........................................................................2, 13

*Env't Def. Fund, Inc. v. Gorsuch*,
   713 F.2d 802 (D.C. Cir. 1983)..................................................................................16

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)....................................................................................13, 14, 15

*Green v. Martin*,
   224 F. Supp. 3d 154 (D. Conn. 2016)...........................................................................7

*Las Ams. Immigr. Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*,
   783 F. Supp. 3d 200 (D.D.C. 2025)...........................................................................17

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr*,
   496 F. Supp. 3d 116 (D.D.C. 2020)................................................................12, 13, 17

*Nat. Res. Def. Council v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020).....................................................................................17

*Nat'l Parks Conservation Ass'n v. Salazar*,
   660 F. Supp. 2d 3 (D.D.C. 2009)...............................................................................16

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015).......................................................................................................1

*Rigdon v. Perry*,
   962 F. Supp. 150 (D.D.C. 1997).................................................................................13

*Ruhumuriza v. Higgins*,
   No. 25-109 (SLS), 2026 WL 587636 (D.D.C. Mar. 3, 2026)....................................15

*S.F. AIDS Found. v. Trump*,
   786 F. Supp. 3d 1184 (N.D. Cal. 2025).......................................................................9

*Talbott v. United States*,
   176 F.4th 720 (D.C. Cir. 2026).....................................................................................8

*Talbott v. United States*,
   775 F. Supp. 3d 283 (D.D.C. 2025)..............................................................................9

**Statutes**

5 U.S.C. § 553...............................................................................................1, 13, 16, 17

5 U.S.C. § 704.........................................................................................................13

5 U.S.C. § 706....................................................................................................17, 18

34 U.S.C. §§ 30301–30309.......................................................................................1, 2, 7

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................12

LCvR 7(h) .........................................................................................................................2

**Regulations**

28 C.F.R. § 115 ........................................................................................... *passim*

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025)................................ *passim*

National Standards to Prevent, Detect, and Respond to Prison Rape, 75 Fed. Reg.
    11077 (proposed Mar. 10, 2010) (to be codified at 28 C.F.R. pt. 115) ....................................3

Notice of Proposed Rulemaking, 76 Fed. Reg. 6248 (proposed Feb. 3, 2011) (to
    be codified at 28 C.F.R. pt. 115)................................................................................................4

**Other Authorities**

*Clarification of National Standards to Prevent, Detect, and Respond to Prison
    Rape*, RIN 1120-AB82, Unified Agenda of Regulatory & Deregulatory
    Actions, Off. of Info. & Regul. Affs., https://perma.cc/Y6TW-BV6X ...................................11

Defs.' Mem. in Opp. to Pls.' Mot. for Prelim. Inj., *Drs. for Am. v. Off. of Pers.
    Mgmt.*,
    No. 1:25-cv-00322-JDB, 2025 WL 1357700 (D.D.C. Mar. 24, 2025)....................................9

*Executive Order Submissions Under Review*, Off. of Info. & Regul. Affs., Off. of
    Mgmt. & Budget, https://perma.cc/HWW5-P4TB ..................................................................11

Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination
    Commission Report* (June 2009), https://perma.cc/3RGD-UQZU .........................................2

**PRELIMINARY STATEMENT**

In 2012, after extensive notice-and-comment rulemaking, the U.S. Department of Justice ("DOJ") promulgated regulations setting national standards for the detection, prevention, reduction, and punishment of prison rape ("PREA Regulations" or "PREA Standards"). These regulations were required by, and fulfilled the purposes of, the Prison Rape Elimination Act ("PREA"), 34 U.S.C. §§ 30301–30309, the law Congress unanimously passed in 2003 that established a zero-tolerance policy for prison rape in the United States.

On December 2, 2025, Defendants DOJ, Tammie Gregg, and Todd Blanche (collectively, "Defendants"), issued a memorandum effectively rescinding every PREA regulation that mentions transgender, intersex, or gender nonconforming individuals (the "Memorandum").[1] Defendants took this action pursuant to Executive Order 14168, which adopted a federal definition of "sex" that does not recognize transgender people. But an executive order does not grant authority to ignore binding regulations.

Under the Administrative Procedure Act ("APA"), agency regulations may only be amended or rescinded through notice-and-comment rulemaking. 5 U.S.C. § 553(b); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("[T]he APA [] mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."). DOJ did not follow these mandatory procedures. As a result, the Memorandum is legally invalid on its face. This Court should grant summary judgment and vacate the Memorandum.

---

[1]    A true and correct copy of the Memorandum is attached at Exhibit 1 to the Statement of Undisputed Material Facts ("SUMF"), filed herewith.

## BACKGROUND

### I.    THE PRISON RAPE ELIMINATION ACT AND PREA REGULATIONS

In 2003, PREA was unanimously passed by Congress and signed into law by President George W. Bush. *See* Pub. L. No. 108-79, 117 Stat. 972, codified at 34 U.S.C. §§ 30301–30309. (SUMF ¶ 1.)[2] PREA's stated purposes include "establish[ing] a zero-tolerance standard for the incidence of prison rape in prisons in the United States," "mak[ing] the prevention of prison rape a top priority in each prison system," and "develop[ing] and implement[ing] national standards for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30302(1)–(3).

### A.    The National Prison Rape Elimination Commission Assessed the Risks Leading to Sexual Abuse and Found That Transgender People Were Particularly Vulnerable

To accomplish its statutory purposes, PREA established the National Prison Rape Elimination Commission (the "Commission"), a bipartisan body tasked with comprehensively studying sexual abuse in correctional facilities and recommending national standards for reducing prison rape. 34 U.S.C. § 30306(a), (d), (e)(1). PREA required the Attorney General to consider the Commission's report and recommendations, along with other appropriate materials, and thereafter exercise independent judgment to promulgate regulations adopting "national standards for the detection, prevention, reduction, and punishment of prison rape." *Id.* § 30307(a)(1)–(2).

In 2009, after five years of research and public hearings, the Commission published its findings and recommendations. *See generally* Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Commission Report* (June 2009), https://perma.cc/3RGD-UQZU [hereinafter Commission Report]. (SUMF ¶ 2.) The Commission specifically found that

---

[2]    Plaintiff is mindful of this Court's Standing Order requiring references to the administrative record in the statement of facts in compliance with LCvR 7(h)(2). However, in this action, no administrative record is needed because Plaintiff is asserting a procedural APA claim. *See, e.g.*, *E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 62 n.3 (D.D.C. 2022).

transgender individuals are at a greater risk of sexual abuse in prisons, and that transgender women in particular are at "extremely high risk for abuse" if housed in men's facilities. Commission Report at 7, 73–74. Based on these findings, the Commission called for "decisive steps" to protect transgender people from prison rape and proposed national standards specific to this population. *Id.* at 7–9, 73–74, 215, 217, 221, 225, 226, 228, 230, 232. Screening—both during intake and subsequently—is the initial protective measure, though "[t]o be effective, the results of these screenings must then drive decisions about housing and programming." *Id.* at 8. Consistent with that approach, the Commission urged "corrections administrators [to] identify and protect many vulnerable individuals from abuse," including transgender individuals. *Id.* at 8–9.

**B.    DOJ Promulgated PREA Regulations Through Notice-and-Comment Rulemaking**

The DOJ rulemaking process began with an Advance Notice of Proposed Rulemaking ("ANPRM") issued on March 10, 2010, titled "National Standards to Prevent, Detect, and Respond to Prison Rape." 75 Fed. Reg. 11077 (proposed Mar. 10, 2010) (to be codified at 28 C.F.R. pt. 115). (SUMF ¶ 3.) The ANPRM solicited public comment on the Commission's proposed PREA Standards. 75 Fed. Reg. at 11079. The ANPRM also explained that DOJ had created a "PREA Working Group" to conduct "an in-depth initial review of the standards proposed by the Commission" and to "prepare a draft final rule."[3] *Id.* at 11078. Before seeking public comment, the PREA Working Group obtained "preliminary input" via listening sessions with "representatives of state and local prisons and jails, juvenile facilities, community corrections

---

[3]    The PREA Working Group consisted of "representatives from a wide range of Department components, including the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Federal Bureau of Prisons, the Civil Rights Division, the National Institute of Corrections, the National Institute of Justice, the Office of Legal Policy, the Office of Legislative Affairs, the Office of Juvenile Justice and Delinquency Prevention, the Office of Justice Programs, the Office for Victims of Crime, and the Office on Violence Against Women." 75 Fed. Reg. 11078.

programs, lockups, state and local sexual abuse associations and service providers, national advocacy groups, survivors of prison rape, and members of the Commission." *Id.*

On February 3, 2011, DOJ published a Notice of Proposed Rulemaking ("NPRM") to establish national standards under PREA. 76 Fed. Reg. 6248 (proposed Feb. 3, 2011) (to be codified at 28 C.F.R. pt. 115). (SUMF ¶ 4.) In developing the NPRM, DOJ considered the Commission's report, the listening sessions conducted by the PREA Working Group, and approximately 650 public comments responding to the ANPRM. *See* 76 Fed. Reg. at 6249–50. DOJ then "made revisions to each of the Commission's recommended standards," incorporating most of the Commission's specific proposals while making substantive changes in various areas. *Id.* at 6250. The resulting NPRM proposed multiple provisions designed to protect transgender, intersex, and gender nonconforming people from sexual abuse through employee trainings, individualized housing assignment considerations, and limits to cross-gender viewing and searches, among others. *See id.* at 6253–54, 6256–58 (including §§ 115.14, 115.31, 115.41, 115.42, 115.114, 115.214, 115.231, 115.241, 115.242, 115.314, 115.331, 115.341, 115.342). More than 1,300 public comments were submitted on the proposed regulations set forth in the NPRM. *See* National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106, 37112 (June 20, 2012) (to be codified at 28 C.F.R. pt. 115). (SUMF ¶ 5.)

On June 20, 2012, DOJ issued the final PREA Regulations, which became effective on August 20, 2012. *See* National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106 (June 20, 2012) (codified at 28 C.F.R. pt. 115). (SUMF ¶ 6.) The PREA Regulations contain specific requirements to protect transgender, intersex, and gender nonconforming individuals, as summarized below.

***Individualized Risk Assessment and Housing Placement***. The PREA Regulations require all incarcerated individuals to undergo an individualized risk assessment within seventy-two hours of intake, and again upon transfer, to assess their risk for sexual abuse. 28 C.F.R. § 115.41(a)–(c). As part of that assessment, facilities must specifically inquire about recognized risk factors, including "[w]hether the inmate is or is perceived to be . . . transgender, intersex, or gender nonconforming." *Id.* § 115.41(d)(7). Likewise, all housing and placement decisions must be made on an individualized basis using information obtained through risk screening. *Id.* § 115.42(a)–(b). For each transgender or intersex individual, officials must determine whether a men's or women's facility placement is appropriate, considering "on a case-by-case basis whether [the] placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." *Id.* § 115.42(c). In making this determination, officials must give "serious consideration" to the individual's own views regarding safety. *Id.* § 115.42(e). Officials must reassess these individuals' housing and programming assignments at least twice annually to review threats to their safety. *Id.* § 115.42(d).

In addition, regardless of housing placement, transgender and intersex individuals must be given an opportunity to shower separately from others. *Id.* § 115.42(f). Prisons may not establish segregated units for transgender or intersex individuals, except in certain enumerated circumstances. *Id.* § 115.42(g); *see also id.* §§ 115.241(d)(7), 115.242(a)–(f) (requiring analogous screening and individualized placement protections in community confinement facilities); *id.* §§ 115.341(a), 115.341(c)(2), 115.342(a), 115.342(c)–(g) (requiring analogous protections in juvenile facilities); *id.* § 115.141(a)–(d) (requiring more limited risk screening in lockups).

***Searches of Incarcerated Persons***. For all incarcerated people, the PREA Regulations prohibit facilities from conducting cross-gender strip searches or visual body cavity searches,

-5-

absent exigent circumstances. *Id.* § 115.15(a). In addition, transgender or intersex individuals may not be searched "for the sole purpose of determining the inmate's genital status." *Id.* § 115.15(e). This information can instead be learned "during conversations with the inmate, by reviewing medical records, or, if necessary, . . . as part of a broader medical examination conducted in private by a medical practitioner." *Id.*; *see also id.* § 115.215(a), (e) (requiring analogous protections for community confinement facilities); *id.* § 115.315(a), (e) (requiring analogous protections for juvenile facilities); *id.* § 115.115(a), (d) (requiring analogous protections in lockups).

*Staff Training*. The PREA Regulations also require comprehensive staff training on numerous topics related to preventing and responding to sexual abuse, including training on "[h]ow to communicate effectively and professionally" with transgender incarcerated individuals, *id.* § 115.31(a)(9), and "how to conduct cross-gender pat-down searches, and searches of transgender and intersex inmates, in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs," *id.* § 115.15(f). *See also id.* §§ 115.231(a)(9), 115.215(f) (requiring analogous training for community confinement facilities); *id.* §§ 115.331(a)(9), 115.315(f) (requiring analogous training for juvenile facilities); *id.* § 115.115(e) (requiring analogous training on how to conduct cross-gender pat-down searches and searches of transgender and intersex detainees in lockups).

*Sexual Abuse Incident Reviews*. The PREA Regulations require facilities to conduct sexual abuse incident reviews following every incident or allegation of sexual abuse. *See id.* § 115.86(a)–(c). Within this framework, Section 115.86(d)(2) requires that incident reviews specifically consider "whether the incident or allegation was motivated by" the victim's "race; ethnicity; gender identity; lesbian, gay, bisexual, *transgender, or intersex identification, status, or perceived status*; or gang affiliation; or was motivated or otherwise caused by other group

-6-

dynamics at the facility." *Id.* § 115.86(d)(2) (emphasis added); *see also id.* § 115.286(d)(2) (requiring analogous protections for community confinement facilities); *id.* § 115.386(d)(2) (requiring analogous protections for juvenile facilities); *id.* § 115.186(d)(2) (requiring analogous protections in lockups).

*Audit Process to Monitor Compliance*. The PREA Regulations impose a mandatory audit process requiring DOJ-certified auditors to make compliance determinations for each regulatory requirement. *Id.* §§ 115.401–05. These requirements apply to *all* covered correctional facilities—including state, federal, and local facilities. *Id.* § 115.401(a) (requiring DOJ to ensure "each facility operated by the agency, or by a private organization on behalf of the agency, is audited at least once" every three years); *id.* § 115.5 (defining "agency" as "the unit of a State, local, corporate, or nonprofit authority, or of the Department of Justice, with direct responsibility for the operation of any facility that confines inmates, detainees, or residents, including the implementation of policy as set by the governing, corporate, or nonprofit authority"). Since PREA does not create a private right of action for incarcerated people, *see Green v. Martin*, 224 F. Supp. 3d 154, 171 (D. Conn. 2016) ("[T]here is no private right of action under the Prison Rape Elimination Act."), PREA's audit framework is the principal mechanism by which PREA is enforced.

A facility's compliance with the PREA Regulations must be evaluated at least once every three years, and agencies bear the burden of demonstrating compliance. 28 C.F.R. § 115.401(a), (e). Any noncompliance identified during an audit "trigger[s] a 180-day corrective action period," during which a facility can be mandated to modify its procedures and take steps to cure the regulatory violations. *Id.* § 115.404(a)–(c). In addition, state and local facilities that fail to comply are at risk of losing federal funding. *See* 34 U.S.C. § 30307(e)(2)(A)–(B) (providing for a five

percent reduction in covered federal funds unless the State submits proof of compliance through certification, including lists of facilities audited, final audit reports, and a proposed audit schedule).

## II.    EXECUTIVE ORDER 14168

On January 20, 2025, the President issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) (the "Gender Ideology Order"). (SUMF ¶ 7.) The Gender Ideology Order stated: "It is the policy of the United States to recognize two sexes, male and female." Gender Ideology Order § 2. It then defined the terms "sex," "women," "girls," "men," "boys," "female," and "male" to ensure that no federal laws or policies recognize transgender people and to deny transgender people equal treatment. *See id.*; *see also Talbott v. United States*, 176 F.4th 720, 734 (D.C. Cir. 2026) (Wilkins, J.) (stating that Executive Order 14168 "denounc[ed] transgender people," "emphatically rejected the legitimacy of people who identify as transgender, and withdrew federal recognition of transgender people"). The Order also directed agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," *id.* § 3(e)—that is, anything that could be understood as "permitting the false claim that males can identify as and thus become women and vice versa," *id.* § 2(f). Similarly, the Executive Order required all federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e); *see also id.* § 3(g). In addition to these general directives, the Executive Order specifically required the Attorney General to amend certain PREA regulations "as necessary" to categorically prohibit corrections officials from housing transgender women in women's facilities. *Id.* § 4(a).

To implement the Gender Ideology Order, federal agencies immediately began working to eliminate any reference to transgender people from federal grants, federal government websites,

agency documents, and other materials. For example, "[t]he Office of Management and Budget—following the President's directives—issued a memo promising to stop the use of federal funds to promote 'transgenderism.'" *Talbott v. United States*, 775 F. Supp. 3d 283, 331 (D.D.C. 2025), *aff'd in part, vacated in part, remanded*, 176 F.4th 720 (D.C. Cir. 2026) (citation omitted). The Office of Personnel Management ordered agencies to remove vital Centers for Disease Control and Prevention pages that "inculcate or promote gender ideology," including "contraception guidelines, vaccine information, and HIV data," causing roughly 8,000 pages to be taken down. *Id.* Additionally, "[t]he federal government removed all references to LGBTQ+ youth from the website for the National Center for Missing and Exploited Children, including a page on the suicide rates of missing children and one on male victims of sex trafficking." *Id.* "It also removed references to LGBTQ+ youth from stopbullying.gov." *Id.*; *see also S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1209, 1215–16 (N.D. Cal. 2025) (describing terminations of federal grants to entities that serve transgender people); Defs.' Mem. in Opp. to Pls.' Mot. for Prelim. Inj., *Drs. for Am. v. Off. of Pers. Mgmt.*, No. 1:25-cv-00322-JDB, 2025 WL 1357700 (D.D.C. Mar. 24, 2025) (representing that "under Executive Order 14168, webpages could no longer use the word 'gender' or contain language promoting gender ideology" and that "every" federal agency "promptly began to implement" the order).

## III.   DEFENDANTS' MEMORANDUM UNLAWFULLY REMOVES PREA PROTECTIONS FOR TRANSGENDER INCARCERATED PEOPLE

On December 2, 2025, Defendants issued the Memorandum declaring that "effective immediately, applicable federal and non-federal correctional facilities shall not be held to subsections of the PREA Standards that may conflict with E.O. 14168." (SUMF ¶¶ 8–9; *id.*, Ex. 1 ("Mem.") at 2.) The Memorandum then stated that "[p]ortions of the PREA Standards are in conflict" with the Gender Ideology Order. (SUMF ¶ 10; Mem. at 1.) The list of "conflicting"

regulations includes *every* provision that references transgender, intersex, or gender nonconforming people and does not identify any other provisions. (SUMF ¶ 11, Mem. at 1–2.)

The Memorandum instructs "all PREA auditors" to "immediately pause from making compliance determinations" concerning the identified PREA Regulations, to "advise" correctional facilities "to disregard" those PREA Regulations, and to "refrain from uploading [audit] documentation" related to those regulatory requirements. (SUMF ¶ 12; Mem. at 2–3.) The Memorandum also excuses facilities from ongoing corrective action obligations arising from prior findings of non-compliance with the identified PREA Regulations. (SUMF ¶ 13; Mem. at 4.) To implement these directives, the Memorandum stated that DOJ's PREA Management Offices were making immediate changes to the Online Audit System and Audit Instrument, including the removal of "[e]ach impacted provision and subsection"; the replacement of each impacted provision and subsection with "a statement that it is no longer relevant to the auditor's compliance determination"; and the addition of a "'Not applicable' option for every impacted provision and subsection with a reminder to the auditor that they must select this option." (SUMF ¶¶ 15–16; Mem. at 2–3.)

Before issuing the Memorandum, DOJ did not amend the PREA Regulations through notice-and-comment rulemaking as required by the APA. The Memorandum expressly recognized that DOJ was in the process of "updating the PREA Standards to align with the requirements of E.O. 14168," but that these updates had not been "finalized." (SUMF ¶¶ 17–18; Mem. at 2.) The Federal Register and Office of Information and Regulatory Affairs ("OIRA") regulatory tracker shows that DOJ's proposed notice of proposed rulemaking to amend the PREA Regulations has

been under OIRA review since September 16, 2025. (SUMF ¶ 19.)[4] Yet the Memorandum directed that, "effective immediately," PREA auditors and, in turn, correctional facilities, should follow the Executive Order and ignore binding PREA Regulations designed to protect transgender, intersex, and gender nonconforming incarcerated people. (SUMF ¶¶ 9, 11; Mem. at 2.)

## IV.    PLAINTIFF PAULINA POE

Plaintiff Paulina Poe is a transgender woman currently incarcerated in a men's correctional facility. (SUMF ¶ 20; *id.*, Ex. 2 ("Poe Decl.") ¶ 1.) During her incarceration, Plaintiff has been subjected to sexual assault by a male prisoner, frequent sexual harassment, and strip searches conducted by male correctional officers in view of other male officers. (Poe Decl. ¶¶ 2, 5–7.)

With the Memorandum in effect, Plaintiff has lost specific protections she relies on to shield her from further sexual abuse. She is no longer guaranteed: (1) the option to shower separately under 28 C.F.R. § 115.42(f); (2) twice-yearly reviews of safety threats that may affect her housing and programming under § 115.42(d); (3) consideration of her transgender status by officials evaluating her risk of sexual victimization under § 115.41(d)(7); (4) "serious consideration" of her own views about her safety in connection with placement and programming decisions under § 115.42(e); (5) consideration for placement in a women's facility on a case-by-case basis under § 115.42(c); (6) protection from unnecessary searches to determine her genital status that lack any penological purpose, *id.* § 115.15(e); (7) security staff who have been trained on how to conduct cross-gender searches and searches of transgender individuals, *id.* § 115.15(f); and (8) the right not to be placed in segregated housing solely because of her transgender status,

---

[4] *See Clarification of National Standards to Prevent, Detect, and Respond to Prison Rape*, RIN 1120-AB82, Unified Agenda of Regulatory & Deregulatory Actions, Off. of Info. & Regul. Affs., https://perma.cc/Y6TW-BV6X (last visited July 22, 2026); *Executive Order Submissions Under Review*, Off. of Info. & Regul. Affs., Off. of Mgmt. & Budget, https://perma.cc/HWW5-P4TB (last visited July 22, 2026). (SUMF ¶ 19.)

*id.* § 115.42(g). Without these safeguards in place, corrections officials may place Plaintiff in dangerous housing, work, or program settings that put her at risk of physical harm, including sexual violence. For example, because of the Memorandum, Plaintiff could be forced to share dorm-style housing and communal showers with men who threaten her, without consideration of the specific risks such an environment poses to her as a transgender woman.

Further, the Memorandum eliminated PREA's key enforcement mechanism—the auditing process—as it relates to the identified PREA Regulations. (SUMF ¶¶ 15–16; Mem. at 2–3.) Plaintiff has availed herself of the auditing process before. (Poe Decl. ¶ 10.) She understands that, before DOJ issued the Memorandum, speaking to an auditor about legal violations could lead to corrective action and enforcement of the PREA Regulations. (*Id.*) But, as she recognizes, "that option is now gone." (*Id.* ¶ 16.) With the Memorandum in effect, the audit process cannot provide any relief to Plaintiff. Her facility would face no risk of a poor audit or corrective action even for blatant violations of the PREA Regulations at issue. As a result, Plaintiff feels "anxious and afraid" for her safety and is worried she will be assaulted "even more" by men in her facility. (*Id.* ¶¶ 14–15.) In her own words: "Without PREA's protections, it's as if I don't exist. I feel like I am screaming but have no voice." (*Id.* ¶ 17.)

## ARGUMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In APA cases, "early summary judgment motions are often appropriate, as '[t]he entire case on review is a question of law, and only a question of law.'" *Am. Hosp. Ass'n v. Dep't of Health & Hum. Servs.*, No. 18-2112 (JDB), 2018 WL 5777397, at *2 (D.D.C. Nov. 2, 2018) (citations omitted); *see, e.g.*, *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 145–46

(D.D.C. 2020) (granting summary judgment in plaintiff's favor on APA claim); *Rigdon v. Perry*, 962 F. Supp. 150, 165 (D.D.C. 1997) (holding for plaintiff on his APA claim at summary judgment). Because the alleged APA violation in this case is procedural, no administrative record is necessary before this Court may grant summary judgment. *E.B.*, 583 F. Supp. 3d at 62 n.3; *Alphapointe v. Dep't of Veterans Affs.*, 475 F. Supp. 3d 1, 12 (D.D.C. 2020) (finding that, when plaintiffs "challenge whether rulemaking was required in the first place," and not the "manner of rulemaking," there is "no obvious need for the administrative record").

## I.     PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HER PROCEDURAL APA AND DECLARATORY JUDGMENT CLAIMS

Defendants' Memorandum is a final agency action:  it unilaterally removes binding PREA Regulations designed to protect transgender incarcerated people "effective immediately." (SUMF ¶¶ 9, 11; Mem. at 2.) The APA requires notice-and-comment rulemaking to rescind these PREA Regulations, 5 U.S.C. § 553, and the Memorandum itself recognizes that DOJ is "currently updating the PREA standards to align with the requirements of E.O. 14168," confirming that the rulemaking process had not been completed before the Memorandum was issued. (*See* Mem. at 2.) Summary judgment in Plaintiff's favor is thus appropriate.

### A.     Defendants' Memorandum is Final Agency Action

The APA permits judicial review of final agency action. 5 U.S.C. § 704; *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025) (Friedrich, J.) ("[T]he APA permits courts to act directly on agency actions."). Agency action is final where the action (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). The agency action's impact must be "sufficiently direct and immediate" and have a "direct effect on . . . day-to-day business." *Franklin*

*v. Massachusetts*, 505 U.S. 788, 796–97 (1992) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967)). Defendants' Memorandum easily meets the test for final agency action.

*First*, the Memorandum is the consummation of Defendants' decisionmaking process because it is clear from the face of the Memorandum that Defendants have made a final decision to immediately and unilaterally rescind PREA Regulations protecting transgender, intersex, and gender nonconforming incarcerated persons. *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 50–51 (D.D.C. 2025) (finding *Bennett's* first prong satisfied because the agencies' removal of webpages consummated their decisionmaking process to comply with an executive order and its implementing guidance); *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 55 (D.D.C. 2020) (finding final agency action where agency guidance "comes to a definitive conclusion" regarding the content and scope of fees permitted under rule at issue).

The language of the Memorandum is mandatory; it declared that "[p]ortions of the PREA standards are in conflict with the requirements in E.O. 14168" and directed that "effective immediately" correctional facilities "shall not be held to" the identified "subsections of the PREA Standards." (SUMF ¶ 9–10; Mem. at 1–2.) The Memorandum further instructed "all PREA auditors" to "immediately pause from making compliance determinations" related to the identified PREA Regulations and to advise correctional facilities to "disregard" those regulations. (SUMF ¶ 12; Mem. at 2–3.) The Memorandum also required auditors, in "all in-progress audits" where corrective action was underway as to any of the identified PREA provisions, to "immediately pause this corrective action" and mark the provision "Not applicable." (SUMF ¶ 14; Mem. at 4.) The Memorandum indicated that corresponding revisions to the Online Audit System and Audit Instrument were already underway and would be complete by December 3, 2025—the very next day. (SUMF ¶ 15; Mem. at 2–3.)

-14-

Nothing in the Memorandum indicates that these changes were anything other than the consummation of Defendants' decision-making process. *See, e.g.*, *Drs. for Am.*, 766 F. Supp. 3d at 51 ("There is nothing in the Executive Order, the OPM memorandum, or even the CDC's website statement that indicates the removals were discretionary or interlocutory."); *see also Ruhumuriza v. Higgins*, No. 25-109 (SLS), 2026 WL 587636, at \*9 (D.D.C. Mar. 3, 2026) (Defendants' "suspension of refugee-application processing" in accordance with an Executive Order was the "consummation of the agency's decisionmaking process" and not "merely tentative or interlocutory"). Rather, by its own admissions, the Memorandum's impact is "direct and immediate." *Franklin*, 505 U.S. at 796–97; *see also Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (holding that agency memorandum constituted final agency action where it "bound DHS staff by forbidding them to continue the program in any way from that moment on" and "resulted in 'rights or obligations [being] determined'").

*Second*, Defendants' Memorandum determines the legal obligations of PREA auditors and the legal rights of transgender, intersex, and gender nonconforming people in custody. *See Bennett*, 520 U.S. at 177–78. It directs PREA auditors to disregard, and "to advise confinement facility and agency representatives to disregard" the identified PREA Regulations, to cease enforcing those regulations, and to reverse any prior corrective action related to them. (Mem. at 2–4.) These directives amount to a rescission of duly promulgated PREA Regulations that were developed to protect transgender, intersex, and gender nonconforming prisoners from sexual violence and rape. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 6–7 (D.C. Cir. 2017) (finding the EPA's stay suspending compliance deadlines was "tantamount to amending or revoking a rule" and had legal consequences because it relieved regulated parties of obligations they otherwise faced). Plaintiff and other transgender individuals are effectively stripped of the legal protections provided by the

-15-

identified PREA Regulations, and they can no longer rely on the audit process to enforce their rights or obtain relief from violations of those regulations.

In short, because the Memorandum represents the "consummation" of Defendants' implementation of the Gender Ideology Order in the PREA context, and "legal consequences will flow" from the Memorandum, the challenged agency action is "'final' and therefore reviewable under the APA." *Bennett*, 520 U.S. at 177–78 (citations omitted).

## B.    Defendants' Memorandum Violates the Procedural Requirements of the APA

To rescind or modify PREA Regulations, Defendants must follow the notice-and-comment rulemaking procedures required by the APA. 5 U.S.C. § 553(b). Notice-and-comment rulemaking is required both "before enacting or amending a rule" and "in order to repeal a rule." *Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3, 5 (D.D.C. 2009). "[A]n agency decision which effectively suspends the implementation of important and duly promulgated standards . . . constitutes rulemaking subject to notice and comment requirements of" the APA. *Env't Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 816 (D.C. Cir. 1983).

Here, Defendants did not complete the notice-and-comment rulemaking process. (Mem. at 2.) Instead, they unilaterally sought to negate all PREA Regulations protecting transgender, intersex, and gender nonconforming people through a single internal document—acting as though the Memorandum were simply a "general statement of policy" exempt from rulemaking requirements. *See* 5 U.S.C. § 553(b)(A). But the Memorandum is no mere policy statement. It speaks in mandatory terms, binds auditors, reverses in-progress corrective action, and rewrites the PREA audit instrument itself. (*See* Mem. at 2–4.) An agency pronouncement that relieves regulated parties of binding obligations is a legislative rule in everything but name, and it cannot escape notice-and-comment requirements by its label. "[C]ases 'in which a government agency seeks to promulgate a rule by another name—evading altogether the notice and comment

-16-

requirements'—[are] the 'most egregious' breaches of notice-and-comment obligations." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014)); *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019) ("Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements.").

Because Defendants altered or rescinded binding PREA Regulations without notice and comment, in direct violation of the APA's requirements, the Memorandum is unlawful. *See* 5 U.S.C. § 553(b); *Cap. Area Immigrs.' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 57–58 (D.D.C. 2020) ("The APA commands that courts 'hold unlawful and set aside agency action[s]' taken 'without observance of procedure required by law.'") (alteration in original) (quoting 5 U.S.C. § 706(2)(D)). The Court should accordingly grant summary judgment to Plaintiff for this APA procedural violation (Count I) and declare the Memorandum unlawful under the APA and that the PREA Regulations referenced in the Memorandum remain in full force and effect under the APA and the Declaratory Judgment Act (Count II). *See NAACP Legal Def. & Educ. Fund, Inc.*, 496 F. Supp. 3d at 140, 145–46 (granting plaintiff summary judgment and entering declaratory relief that the agency defendants' conduct was unlawful).

## II.    VACATUR OF THE MEMORANDUM IS THE PROPER REMEDY

The law is clear: When "a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated." *Cabrera*, 792 F. Supp. 3d at 105–06; *see also Las Ams. Immigr. Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, 783 F. Supp. 3d 200, 231 (D.D.C. 2025), *reconsideration denied*, No. CV 24-1702 (RC), 2025 WL 2105564 (D.D.C. July 28, 2025) ("When an agency's action is unlawful, 'vacatur is the normal remedy.'") (citation omitted)); *Blue Water Navy Viet. Veterans Ass'n, Inc. v. McDonald*, 830 F.3d 570, 578 (D.C. Cir. 2016) ("[V]acatur is the 'normal remedy.'" (citation omitted)); *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103

-17-

(D.C. Cir. 2013) ("the court typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment"). The APA expressly requires vacatur of final agency action that failed to follow required procedures. 5 U.S.C. § 706(2)(D).

Here, the Memorandum unlawfully seeks to end-run the APA's notice-and-comment requirements to modify the PREA Regulations. That the Memorandum sought to fulfill the policy of the Gender Ideology Order does not change the vacatur relief mandated by law. *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 148–50 (D.D.C. 2025) (vacating an Office of Personnel Management memorandum that directed federal agencies to "[t]ake down" webpages "promot[ing] gender ideology" to implement Executive Order 14168, and reaffirming that "[u]nsupported agency action normally warrants vacatur").

Accordingly, Plaintiff respectfully requests that the Court vacate the Memorandum.

## CONCLUSION

For these reasons, Plaintiff respectfully asks this Court to enter summary judgment in her favor, issue appropriate declaratory relief, and vacate the Memorandum.

Dated:  July 23, 2026

Respectfully submitted,

Sarah Austin (*D.D.C. admission pending*)
**GLBTQ LEGAL ADVOCATES & DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350

Amy Whelan (*D.D.C. admission pending*)
**NATIONAL CENTER FOR LGBTQ RIGHTS**
1401 21st Street #11548
Sacramento, CA 95811
(415) 365-1338

*/s/ Alexander Shalom*
Alexander Shalom (NJ055)
Natalie Kraner (NY0304)
Kegan A. Brown (admitted *pro hac vice*)
Amanda K. Cipriano (admitted *pro hac vice*)
Mikayla R. Berliner (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, NJ 07960
(212) 419-5866

Alyssa C. Lareau (D.C. Bar ID 494881)
**WARDENSKI P.C.**
300 New Jersey Avenue NW, Suite 300
Washington, D.C. 20001
(202) 935-4224

*Attorneys for Plaintiff Paulina Poe*

-18-