**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PAULINA POE,

Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE; TAMMIE M. GREGG, in her official capacity as Principal Deputy Director, Bureau of Justice Assistance; and TODD BLANCHE, in his official capacity as Attorney General of the United States,

Defendants.

Case No. 1:26-cv-01552 (DLF)

# PLAINTIFF'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Sarah Austin (ME0007)
**GLBTQ LEGAL ADVOCATES & DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350

Amy Whelan (*D.D.C. admission pending*)
**NATIONAL CENTER FOR LGBTQ RIGHTS**
1401 21st Street #11548
Sacramento, CA 95811
(415) 365-1338

Alexander Shalom (NJ055)
Natalie Kraner (NY0304)
Kegan A. Brown (admitted *pro hac vice*)
Amanda K. Cipriano (admitted *pro hac vice*)
Mikayla R. Berliner (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, NJ 07960
(212) 419-5866

Alyssa C. Lareau (D.C. Bar ID 494881)
**WARDENSKI P.C.**
300 New Jersey Avenue NW, Suite 300
Washington, D.C. 20001
(202) 935-4224

*Attorneys for Plaintiff Paulina Poe*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 3

I. PLAINTIFF HAS ARTICLE III STANDING ..... 3

A. Plaintiff Has Suffered a Concrete Injury ..... 3

B. Plaintiff's Injury Is Directly Traceable to the Memorandum and Redressable by Vacatur of the Memorandum ..... 7

II. THE MEMORANDUM IS FINAL AGENCY ACTION ..... 12

A. The Memorandum Marks the Consummation of DOJ's Decisionmaking ..... 12

B. The Memorandum Determines Rights and Obligations and Produces Legal Consequences ..... 13

C. Defendants' Arguments that the Memorandum Is Not Final Agency Action Are Easily Refuted ..... 16

III. THE MEMORANDUM IS REVIEWABLE BY THIS COURT ..... 20

IV. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HER CLAIMS ..... 25

CONCLUSION ..... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Richardson*,
480 F.2d 1159 (D.C. Cir. 1973) ....................23

*Ali v. Rumsfeld*,
649 F.3d 762 (D.C. Cir. 2011) ....................27

*Amica Ctr. for Immigr. Rts. v. Exec. Off. for Immigr. Rev.*,
822 F. Supp. 3d 119 (D.D.C. 2026) ....................28

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
64 F.4th 1354 (D.C. Cir. 2023) ....................27

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ....................8

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*,
No. 1:25-CV-00999, 2026 WL 523023 (D.D.C. Feb. 25, 2026) ....................5

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015) ....................16, 17, 18

*Ass'n of Irritated Residents v. EPA*,
494 F.3d 1027 (D.C. Cir. 2007) ....................22, 23

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ....................18, 26

*Baltimore Gas & Electric Co. v. FERC*,
252 F.3d 456 (D.C. Cir. 2001) ....................25

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................11, 12, 13, 15

*Biden v. Texas*,
597 U.S. 785 (2022) ....................18

*CC Distribs., Inc. v. United States*,
883 F.2d 146 (D.C. Cir. 1989) ....................5

*Ciox Health, LLC v. Azar*,
435 F. Supp. 3d 30 (D.D.C. 2020) ....................13

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................3

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017) ....................................................................15, 18, 19, 27

*Crowley Caribbean Transp., Inc. v. Peña*,
37 F.3d 671 (D.C. Cir. 1994) ....................................................................................23

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) ..................................................................................4, 7

*Drs. for Am. v. Off. of Pers. Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) ............................................................................13

*Env't Def. Fund v. Gorsuch*,
713 F.2d 802 (D.C. Cir. 1983) ...............................................................................16, 18

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).......................................................................................................19

*Gen. Elec. Co. v. Env'tl Prot. Agency*,
290 F.3d 377 (D.C. Cir. 2002) ....................................................................................20

*Green v. Martin*,
224 F. Supp. 3d 154 (D. Conn. 2016) ..........................................................................6

*Heckler v. Chaney*,
470 U.S. 821 (1985)............................................................................................ *passim*

*Lincoln v. Vigil*,
508 U.S. 182 (1993).......................................................................................................21

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..........................................................................................4, 7, 9, 10

*Mantena v. Johnson*,
809 F.3d 721 (2d Cir. 2015)...........................................................................................5

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ....................................................................................4

*Mokhtar v. Kerry*,
83 F. Supp. 3d 49 (D.D.C. 2015) ................................................................................26

*Murthy v. Missouri*,
603 U.S. 43 (2024)...........................................................................................8, 9, 10

*NAACP v. U.S. Dep't of Educ.*,
779 F. Supp. 3d 53, 62 (D.D.C. 2025) ..........................................................................4

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .......... 21

*Russell-Murray Hospice, Inc. v. Sebelius*,
724 F. Supp. 2d 43 (D.D.C. 2010) .......... 27, 28

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 4

*Teton Hist. Aviation Found. v. U.S. Dep't of Def.*,
785 F.3d 719 (D.C. Cir. 2015) .......... 5

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) .......... 2, 19

*United States v. Texas*,
599 U.S. 670 (2023) .......... 24

**Statutes**

5 U.S.C. § 701 .......... 20, 21, 23

5 U.S.C. § 702 .......... 3

5 U.S.C. § 706 .......... 27, 28, 29

18 U.S.C. § 4042 .......... 10

34 U.S.C. § 30307 .......... *passim*

**Regulations**

28 C.F.R. § 115 .......... 14

28 C.F.R. § 115.15 .......... 4, 10

28 C.F.R. § 115.31 .......... 10

28 C.F.R. § 115.41 .......... 4, 10

28 C.F.R. § 115.42 .......... 4, 10

28 C.F.R. § 115.86 .......... 10

28 C.F.R. §§ 115.401–05 .......... 8

28 C.F.R. § 115.401 .......... *passim*

28 C.F.R. § 115.403 .......... *passim*

28 C.F.R. § 115.404 .......................................................................................................... *passim*

28 C.F.R. § 115.501 ..........................................................................................................16, 24

## PRELIMINARY STATEMENT

Defendants concede that "[a]ny repeal of the PREA regulations would have to go through the notice and comment procedure" required by the Administrative Procedure Act ("APA"), and they do not dispute that the Memorandum went through none. (Defs.' Combined Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summ. J., Dkt. Nos. 25, 26 ("Defs.' Opp'n") at 14.) Defendants instead seek to excuse their APA procedural violation by arguing that the Memorandum is not final agency action, that the Memorandum is exempt from APA review because it involves matters committed to agency discretion by law, and that Plaintiff does not have standing. These arguments ignore the undisputed facts and binding law. Plaintiff is entitled to judgment as a matter of law, and this Court should grant Plaintiff's summary judgment motion and deny Defendants' cross-motion.

The Memorandum is no mere guidance document. The text of the Memorandum makes clear Defendants made a final determination that the PREA Standards protecting transgender, intersex, and gender non-conforming individuals – embodied in duly promulgated regulations – are no longer binding law that must be followed. That decision has legal consequences for Defendants, auditors, state and federal corrections agencies, and most importantly, for incarcerated people. As such, the Memorandum plainly satisfies the legal standard for final agency action.

Defendants' suggestion that the Memorandum is a typical exercise of prosecutorial discretion under *Heckler v. Chaney* is similarly misplaced. The PREA Regulations require audits of each individual PREA Standard, including those identified in the Memorandum. 28 C.F.R. § 115.403(c). The PREA Regulations also prescribe a mandatory corrective action process designed to achieve compliance where it is lacking. *Id.* § 115.404. Defendants have no discretion to suspend

the identified PREA Standards by memorandum, and the enforcement-discretion authorities on which they rely address a different question entirely.

Defendants are also incorrect that Plaintiff lacks standing. Plaintiff's concrete, non-speculative injury has already occurred: The Memorandum deprives her of regulatory protections (*i.e.*, the PREA Standards) and benefits (the PREA audit process) that previously existed and were rightly treated as binding law. The loss of an established legal protection and benefit without required notice-and-comment rulemaking establishes an injury for standing purposes, and this Court can and should redress Plaintiff's injury by vacating the Memorandum.

Defendants' standing argument, moreover, treats PREA audits as carrying no practical consequence, while their *Chaney* argument treats the same audits as an exercise of enforcement authority committed to agency discretion. Those positions are in tension: if audits carry no consequences, *Chaney* has no application; if they are enforcement, the Memorandum's suspension of them has legal consequences that both confer standing and render the Memorandum final.

At bottom, the Memorandum does precisely what the law forbids—it suspends the very regulations Defendants admit are subject to notice-and-comment rulemaking. The Memorandum transparently admits its purpose is to implement Executive Order 14168 (the "Gender Ideology Order") and negate protections for transgender, intersex, and gender non-conforming people at state and federal correctional facilities across the country. But no executive order can change an agency's long-settled obligation to follow its own regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954). Defendants' principal response—that a memorandum cannot lawfully repeal a regulation, so the Memorandum must not have done so—confuses what the Memorandum may lawfully do with what it purports to do and what it has in fact done. An agency that wants the effect of a repeal must use notice and comment. A directive

that achieves that effect without those procedures is not thereby rendered harmless; it is thereby rendered unlawful. This Court should grant Plaintiff's motion, vacate the Memorandum, and deny Defendants' cross-motion for summary judgment.

## ARGUMENT

### I. PLAINTIFF HAS ARTICLE III STANDING

Defendants lead with the contention that Plaintiff lacks Article III standing. (*See* Defs.' Opp'n at 6–10.) She has it. The PREA Standards at issue were designed to protect incarcerated individuals like Plaintiff from sexual abuse. And Plaintiff is directly affected by Defendants' unilateral and immediate suspension of the binding PREA Standards that protect her.

#### A. Plaintiff Has Suffered a Concrete Injury

Defendants argue that to have standing, Plaintiff must show she has been sexually assaulted, strip-searched by a male officer, or placed in dangerous housing as a direct result of the Memorandum, such that some sexual assault is "certainly impending." (*See* Defs.' Opp'n at 6–8 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)).[1]) A procedural APA claim, however, requires no such showing.

*First*, Plaintiff challenges Defendants' suspension of legally binding regulations without the notice-and-comment rulemaking the APA requires. In such a procedural challenge, a plaintiff need not satisfy the heightened standards of redressability and immediacy that apply to other standing inquiries. Rather, she need only show that the regulations at issue affected her concrete interests. *See* 5 U.S.C. § 702 (providing "right of review" to any person "suffering legal wrong

[1] *Clapper* addressed a fundamentally different situation—plaintiffs who alleged future injury based on a speculative chain of events about whether the government would eventually target their communications. 568 U.S. at 411. Here, Plaintiff's injury is not a prediction about what third parties may do; it is the accomplished removal of a legal protection and enforcement mechanism that applied to her the day before the Memorandum issued.

because of agency action, or adversely affected or aggrieved by agency action"); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). In *Lujan*, the Supreme Court recognized that a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* The D.C. Circuit applies that principle through a three-part test: a plaintiff asserting a procedural injury must show (1) that the agency omitted a required procedure, (2) that the procedure was designed to protect a threatened concrete interest of hers, and (3) that the omission affects that interest. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182–84 (D.C. Cir. 2017). What a plaintiff may not do is assert a procedural right "*in vacuo*," untethered to any concrete interest. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Plaintiff's concrete interest could not be more tangible. The affected Standards govern how she is screened for risk of sexual victimization, whether and how she is searched by male officers, how she is housed, and more. *See, e.g.*, 28 C.F.R. §§ 115.15, 115.41, 115.42. Those are interests in bodily safety and privacy, and the notice-and-comment requirement exists precisely so that people whose safety depends on a regulation are heard before it is withdrawn.

This Court has applied the same principle in the APA notice-and-comment context. In *NAACP v. U.S. Department of Education*, the court found standing where an agency changed regulations without notice and comment and the plaintiffs' members were directly affected by those regulations by being "deprived of the 'procedural right to protect [their] concrete interests.'" 779 F. Supp. 3d 53, 62 (D.D.C. 2025) (Friedrich, J.). So too here. Plaintiff is a transgender person incarcerated in a correctional facility, precisely the kind of individual the identified PREA Standards were designed to protect. (*See* Pl.'s SUMF ¶ 20.) The Memorandum's suspension of those PREA Standards, and on which Plaintiff relied for protection from sexual abuse, directly

affects her. (*See id.*; *see also* Poe Decl. ¶¶ 14–17 (discussing the real-world effects of the Memorandum, including that "[t]he memo requires PREA auditors to ignore issues that put transgender people like me at risk").) That is sufficient to establish injury.

Any other result would undermine the very purpose of procedural APA claims. If an agency could unilaterally revoke regulations in violation of the APA and then defeat standing by arguing that the affected individual cannot prove with certainty that the revocation will lead to imminent harm, the APA's notice-and-comment requirement would be rendered unenforceable by the people it is meant to protect.

*Second*, while it is sufficient for standing purposes that the regulations affect her legal interests, Plaintiff has also been injured in other ways. The Memorandum deprives her, for instance, of the protections and processes the PREA Standards mandate and that Plaintiff relies on. That loss is a legally cognizable injury in fact for standing purposes. *See, e.g.*, *Mantena v. Johnson*, 809 F.3d 721, 731 (2d Cir. 2015) (finding plaintiff's lost opportunity to pursue immigration benefits she is entitled to sufficient to demonstrate she suffered an "injury-in-fact"); *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 1:25-CV-00999, 2026 WL 523023, at *7 (D.D.C. Feb. 25, 2026) (finding termination of a peer-review program sufficient to show injury-in-fact because it constitutes a deprivation "of an opportunity to pursue a benefit") (citing *Teton Hist. Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015)); *see also CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit . . . even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity." (emphasis omitted)).

But for the Memorandum, the PREA audit process guarantees Plaintiff a benefit: periodic evaluations of her correctional facility's compliance with each PREA Standard protecting transgender incarcerated individuals, and the promise of corrective action for noncompliance. *See* 28 C.F.R. §§ 115.403(b)–(c), 115.404. Because PREA does not provide a private right of action, *see Green v. Martin*, 224 F. Supp. 3d 154, 171 (D. Conn. 2016), the audit framework is the principal mechanism for assessing and enforcing a facility's compliance with the PREA Standards. By directing auditors not to assess compliance with certain PREA Standards, the Memorandum eliminated the process through which those Standards protect Plaintiff, thereby causing a concrete injury.

The Memorandum also deprives Plaintiff of the opportunity to personally pursue protections under the identified PREA Standards by participating in the audit process. Before Defendants issued the Memorandum, she could facilitate enforcement of those standards by reporting violations to a DOJ-certified auditor,[2] which could prompt a finding of noncompliance and a mandatory corrective action plan at the facility where she is housed. (Poe Decl. ¶¶ 10, 16.) Now, the Memorandum has stripped her of any meaningful opportunity to participate in the same way going forward. It instructs auditors to "immediately pause from making compliance determinations" on the identified regulations, to mark those provisions "Not applicable," and to advise correctional facilities to "disregard" them. (Pl.'s SUMF ¶¶ 12, 14; Mem. at 2–4.) DOJ even rewrote the Online Audit System and Audit Instrument to remove each impacted provision and replace it with a statement that it is "no longer relevant to the auditor's compliance

---

[2] *See* 28 C.F.R. § 115.401(n) (inmates "shall be permitted to send confidential information or correspondence to the auditor in the same manner as if they were communicating with legal counsel"); (*see also* Defs.' Opp'n at 3 (relying on the same provision)).

determination." (Pl.'s SUMF ¶¶ 15–16; Mem. at 2–3.)[3] As a result, Plaintiff can no longer utilize the audit process to secure for herself the protections those regulations guarantee. (*See* Poe Decl. ¶ 16.)

These are not speculative injuries. They are concrete, actual, unlawful deprivations of legal rights and benefits provided to Plaintiff by the PREA Standards.

**B. Plaintiff's Injury Is Directly Traceable to the Memorandum and Redressable by Vacatur of the Memorandum**

Even with the "relaxed redressability requirement" for procedural-rights plaintiffs, *see Ctr. for Biological Diversity*, 861 F.3d at 185, the summary judgment record makes clear that Plaintiff's injury—the loss of the legal protections and benefits afforded by PREA—is traceable to the Memorandum and redressable by this Court through vacatur of the unlawful Memorandum under the APA.

As an initial matter, but for the Memorandum, Plaintiff's facility would still be audited for compliance with the applicable PREA Standards, and she would still have the benefit of the corrective-action process those Standards prescribe. Thus, Plaintiff satisfies the Article III standing requirement of traceability. *See Lujan*, 504 U.S. at 560 (injuries have to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court" (citation modified)).

Defendants assert that any injuries cannot be traced to the Memorandum because "auditors have no authority to make changes to any correctional facility that they audit" and are merely third parties who "inspect facilities and write reports." (Defs.' Opp'n at 1, 8.) This drastically misstates the audit process's significance. The PREA Standards impose a mandatory audit process requiring

[3] Defendants' contention that Plaintiff is not injured because her facility's next full audit is not imminent, (Defs.' Opp'n at 6–9), is addressed in Part I.B, *infra*.

DOJ-certified auditors to make compliance determinations for each regulatory requirement. 28 C.F.R. §§ 115.401–05. Any noncompliance identified during an audit triggers an 180-day corrective action period during which a facility can be mandated to modify its procedures and implement a corrective action plan. 28 C.F.R. § 115.404(a)–(c). In addition, some facilities that fail to comply are at risk of losing federal funding, as Congress ties funding consequences to compliance. *See* 34 U.S.C. § 30307(e)(2)(A)–(B). The audit process is not the toothless reporting exercise Defendants describe; it is the regulatory backbone through which PREA compliance is monitored and enforced.

In addition, contrary to Defendants' arguments, a PREA auditor is not "some third party" engaging in "independent action" beyond the government's control. *Cf. Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). PREA auditors are DOJ-certified and must carry out instructions given to them by DOJ. 34 U.S.C. § 30307(e)(8)(A)(ii)–(iii) (If an auditor "fails to comply with a certification agreement or to conduct audits in accordance with the PREA Auditor Handbook, audit methodology, and instrument approved by the PREA Management Office, the Office may take remedial or disciplinary action, as appropriate, including decertifying the auditor"). Their conduct—and, in particular, how Defendants direct that conduct—is therefore fairly traceable to Plaintiff's injuries. Indeed, *Murthy* recognizes that a plaintiff can satisfy traceability by showing that third parties "will likely react in predictable ways" to the government's conduct. *Murthy*, 603 U.S. at 58.

Defendants' principal redressability argument is one of timing: because Plaintiff's facility was last audited more than a year ago, is not scheduled to be audited again imminently, and audits take ten to twelve months to complete, Defendants say that vacatur "will do nothing for Plaintiff's immediate needs." (Defs.' Opp'n at 9.) That argument misconceives the injury. Plaintiff's injury

is the present loss of a legal protection and of the enforcement mechanism that gives it force—not the postponement of a future inspection. That loss occurred on December 2, 2025, and it continues every day the Memorandum remains in effect. *Lujan* itself makes the point: a person living beside the site of a proposed dam may challenge the failure to prepare an environmental impact statement "even though the dam will not be completed for many years." 504 U.S. at 572 n.7. Defendants' own timeline, moreover, cuts against them. If the Memorandum stands, it is certain—not speculative—that the next audit of Plaintiff's facility will omit every Standard protecting transgender prisoners, and that the months-long audit that follows will end with no finding, no corrective action plan, and no remedy on those Standards. Only vacatur changes that outcome. And the regulations do not confine Plaintiff to the triennial schedule: DOJ may recommend an expedited audit where it "has reason to believe that a particular facility may be experiencing problems relating to sexual abuse," 28 C.F.R. § 115.401(c), an avenue the Memorandum forecloses for the very category of problems Plaintiff faces.

Defendants also contend that any PREA violations in Plaintiff's facility are the responsibility of "the facility or its overseeing agency" and therefore bear no relationship to the Memorandum. (*See* Defs.' Opp'n at 8.) As explained above, however, DOJ controls all auditors whether they are auditing federal, state, or local facilities. The government cannot invoke the independent-third-party doctrine to defeat traceability when the allegedly "independent" actor is its own subordinate agency, operating under its own authority. *See Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (making clear that the independent-decisionmaker concern applies to third parties who are "not before the court" (emphasis added)). Defendants declared in the Memorandum that the identified PREA Standards are no longer enforceable. (Mem. at 2.) Plaintiff thus has standing regardless of where she is housed.

For those housed in federal facilities, Defendants themselves acknowledge that, "in the case of federal facilities," the agency responsible for compliance "is BOP and DOJ." (Defs.' Opp'n at 14.) The Bureau of Prisons ("BOP") is a component of DOJ, the lead defendant in this action. 18 U.S.C. § 4042. The government cannot invoke the independent-third-party doctrine to defeat traceability when the allegedly "independent" actor is its own subordinate agency, operating under its own authority. *See Murthy*, 603 U.S. at 57 (making clear that the independent-decisionmaker concern applies to third parties who are "*not before the court*" (emphasis added) (citation omitted)). Defendants declared in the Memorandum that the identified PREA Standards are no longer enforceable. (Mem. at 2.) A subordinate agency conforming its policies to the stated position of Defendants is not the kind of "independent action of some third party" that defeats traceability under Article III. *Lujan*, 504 U.S. at 560. Nor is it mere "guesswork," as Defendants claim. (Defs.' Opp'n at 10.) It is the direct and foreseeable consequence of the challenged government action. (*See* Plaintiff's Supplemental Statement of Undisputed Material Facts ("Pl.'s Supp. SUMF"), filed herewith ¶ 3, Ex. 2 [hereinafter BOP Program Statement 5333.01].)

The record confirms the point. On March 19, 2026—three and a half months after the Memorandum issued—BOP rescinded its prior sexual-abuse prevention policy and replaced it with one that strips out all applicable PREA Standards the Memorandum identified. (*See* BOP Program Statement 5333.01 at 17–18, 25, 32, 34, 63 (listing sexual abuse policy revisions, rescinding prior policy and removing references to 28 C.F.R. §§ 115.15(e)–(f), 115.31(a)(9), 115.41(d)(7), 115.42(c)–(g), 115.86(d)(2)).) That revision matters in three ways. First, it refutes Defendants' assertion that the Memorandum has no impact on facility policies because it did not directly "alter the policies or operating procedures of any state or federal facility" and did not directly instruct facilities "to revise policies." (Defs.' Opp'n at 14.) Second, it shows that the consequence

Defendants dismiss as "guesswork" has already occurred: [redacted]. Third, [redacted][4]

In sum, Plaintiff has met the requirements for standing. The affected Standards govern how she is screened, searched, and housed; the Memorandum stripped away the only mechanism through which those Standards are enforced; and regardless of where Plaintiff is housed, Defendants' own corrections component has already conformed its policy to the Memorandum. Plaintiff therefore has standing to challenge Defendants' unlawful suspension of binding regulatory protections and circumvention of the APA procedures that safeguard those protections. Plaintiff's harms are directly traceable to the Memorandum. Because of the Memorandum, she has lost her opportunity to meaningfully pursue and obtain enforcement of the identified PREA Standards. So long as the Memorandum stands, her facility cannot be held noncompliant or subject to corrective action for violations of the PREA Standards or for maintaining noncompliant policies. And this harm can be directly redressed by vacatur of the improperly issued Memorandum.

[4] Plaintiff includes redactions in the public filing of this document in accordance with this Court's May 26, 2026 Order requiring redaction of information that would identify Plaintiff. (Dkt. No. 8.)

## II. THE MEMORANDUM IS FINAL AGENCY ACTION

The Memorandum constitutes final agency action because (1) it marks the consummation of DOJ's decision-making process; and (2) it determines rights and obligations and produces legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

### A. The Memorandum Marks the Consummation of DOJ's Decisionmaking

Defendants issued the Memorandum to effectuate their compliance with the Gender Ideology Order. (Pl.'s SUMF ¶¶ 9–11; Defs.' Resp. to Pl.'s SUMF, (Dkt. No. 26-2), ¶¶ 9–11.) The Memorandum's text confirms that Defendants reached a definitive decision to unilaterally render the affected PREA Standards legally ineffective. (*See generally* Mem.) There cannot be any dispute about this fact: the Memorandum expressly states that, notwithstanding that the PREA Standards are binding regulations, "***effective immediately***, applicable federal and non-federal correctional facilities ***shall not be held to***" the PREA Standards that conflict with the Gender Ideology Order. (*Id.* at 2 (emphasis added).) To ensure compliance with this directive, the Memorandum instructed PREA auditors to tell correctional facilities to ignore binding PREA Standards protecting transgender incarcerated individuals, and "immediately pause" any compliance determinations relating to those PREA Standards. (*See* Pl.'s SUMF ¶¶ 9, 12, 14; Defs.' Resp. to Pl.'s SUMF ¶¶ 9, 12, 14; Defs.' Opp'n at 5, 13.) Defendants also immediately altered the online PREA Auditing System and audit instrument to remove the affected PREA Standards—which meant auditors could not assess these provisions even if they wanted to—and terminated corrective actions already underway at facilities previously found noncompliant. (Pl.'s SUMF ¶¶ 14–16; Defs.' Resp. to Pl.'s SUMF ¶¶ 14–16.) Together, these directives suspend the affected Standards going forward and extinguish pending corrective action for past violations.

These actions fall squarely within the scope of agency actions deemed "final." For instance, in *Doctors for America*, the court found the first *Bennett* prong satisfied where the agency

removed webpages, despite the government's argument that some of the webpages were restored and that it was still evaluating the issue. *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 50–51 (D.D.C. 2025). The court rejected that argument, reasoning that because the government's memorandum directed certain action, its issuance was final agency action. *Id.* at 51. The same is true here. The Memorandum provides a decision that applies to all correctional facilities and PREA auditors: the PREA Standards deemed inconsistent with the Gender Ideology Order are no longer binding regulations that PREA auditors or correctional facilities must follow, and Defendants have not even purported to restore the web-based auditing tools. (*See* Pl.'s SUMF ¶¶ 8–16.)

### B. The Memorandum Determines Rights and Obligations and Produces Legal Consequences

Agency action is final when it is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (citation modified). When assessing this prong, courts examine the "concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 56 (D.D.C. 2020) (citation omitted).

Here, the Memorandum unilaterally and "immediately" suspends duly promulgated regulations that previously protected transgender, intersex, and gender non-conforming incarcerated individuals. (Pl.'s SUMF ¶¶ 9, 12; Defs.' Resp. to Pl.'s SUMF ¶¶ 9, 12.) Defendants' attempt to characterize the Memorandum as merely instructing facility staff not to upload certain documentation cannot be squared with the text of the Memorandum itself. (*Compare* Defs.' Opp'n at 14–15, *with* Mem. at 2–4.) The Memorandum, in no uncertain terms, declares that facilities "shall not be held to" the identified PREA Standards. (*See* Mem. at 3.) That decision (and overall objective) does not disappear just because the Memorandum also has a secondary directive relating

to document uploads for PREA audits. (*See* Pl.'s SUMF ¶ 12.) Defendants' argument fails to account for the full spectrum of mandatory directives included in the Memorandum: terminating enforcement of binding regulatory provisions that affect transgender, intersex, and gender-nonconforming incarcerated people (and no one else); removing those provisions from the online auditing system and audit instrument, directing PREA auditors to disregard the same provisions and to tell facility staff to disregard them, and extinguishing pending corrective actions addressing past violations. (*See* Mem. at 2–4.) Further, the instruction that auditors "advise confinement facility and agency representatives to disregard the impacted provisions" plainly imposes a separate obligation than the instruction that facility staff "refrain from uploading documentation that is no longer relevant to audits." (Mem. at 3.) A facility told to "disregard" a regulation has been told something about its own obligations, not merely about its paperwork.

That the Memorandum suspends only the regulations that apply to transgender, intersex, and gender non-conforming incarcerated people, and not the entirety of 28 C.F.R. pt. 115, is of no legal consequence. Defendants incorrectly suggest that because some regulations remain in place, they are merely directing PREA auditors "to pause auditing on certain sections of the PREA standards." (*See* Defs.' Opp'n at 15.) But that is just another way of explaining why Defendants acted unlawfully.

Under 28 C.F.R. § 115.403(c), an auditor must determine "[f]or each PREA standard" whether a facility exceeds, meets, or does not meet the standard. If a facility is noncompliant with one or more standards, that triggers corrective action followed by another compliance determination. *Id.* § 115.404. The Memorandum overrides those requirements for every PREA Standard intended to protect transgender, intersex, or gender non-conforming incarcerated people, prohibiting auditors from making the prescribed compliance determinations, requiring them to

select "Not Applicable," and directing them to "immediately pause" corrective action already underway. (*See* Mem. at 3–4.)

Put another way, the Memorandum eliminates every consequence the regulations attach to noncompliance with these particular PREA Standards, both for corrective action already underway and going forward. (*See* Pl.'s SUMF ¶¶ 9–12, 14, 16; Defs.' Resp. to Pl.'s SUMF ¶¶ 9–12, 14, 16.) That unequivocal command is an agency decision that determines "rights or obligations" and causes "legal consequences." *Bennett*, 520 U.S. at 178. It is hard to think of a more clear-cut example of an agency decision having legal consequences than a directive that unilaterally suspends enforcement of mandatory PREA Standards designed to protect a specific group of prisoners, "effective immediately." (Pl.'s SUMF ¶¶ 8–9.); *see, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 6–8 (D.C. Cir. 2017) (holding that the EPA's partial stay of specified regulatory requirements constituted final agency action because it was "tantamount to amending or revoking a rule," even though the remainder of the rule remained in effect).

PREA's statutory and regulatory framework confirms the legal significance of the Memorandum's directives. Audits are the prescribed mechanism for determining compliance with the PREA Standards, and they are mandatory for all facilities. *See* 28 C.F.R. § 115.401(a) (each facility must be audited at least once every three years); *id.* § 115.403(c) ("For each PREA standard, the auditor shall determine whether the audited facility" has achieved compliance with the standard). For both state and federal facilities, a finding of noncompliance triggers a mandatory process during which "[t]he auditor and the agency *shall* jointly develop a corrective action plan *to achieve compliance*." *Id.* § 115.404(b) (emphasis added). In addition, for state facilities, Congress tied federal funding consequences to proof of compliance through completed audit reports. 34 U.S.C. § 30307(e)(2) (explaining that certain federal funding "shall be reduced by 5

percent" unless the state certifies "full compliance with" the PREA standards and submits relevant documentation, including all final audit reports completed in the past year); 28 C.F.R. § 115.501(a) (requiring Governors to "consider the results of the most recent agency audits" in determining and certifying compliance with the PREA standards for all facilities in the state). By preventing auditors from making compliance determinations for the affected provisions and terminating corrective action, the Memorandum disables the mechanism through which noncompliance produces regulatory consequences. *See Env't Def. Fund v. Gorsuch*, 713 F.2d 802, 818 (D.C. Cir. 1983) (holding that suspension of the implementation of regulatory standards constitutes rulemaking).

Defendants' suggestion that the audit process is merely administrative and PREA compliance is ultimately up to facilities, (*see* Defs.' Opp'n at 1, 9–10, 13–14), thus vastly mischaracterizes the regulatory scheme at issue in this case. This includes the requirement that "[t]he auditor and the agency shall jointly develop a corrective action plan to achieve compliance." 28 C.F.R. § 115.404(b). By directing auditors to cease compliance determinations and "immediately pause" corrective action, the Memorandum removes a mandatory and necessary participant from the process, effectively nullifying the affected PREA Standards.

At its core, the Memorandum is final agency action because its mandatory directives to disregard binding PREA Standards have immediate legal consequences.

### C. Defendants' Arguments that the Memorandum Is Not Final Agency Action Are Easily Refuted

Ignoring the unambiguous language of the Memorandum and its legal consequences, Defendants argue that the Memorandum is not final agency action because it is mere guidance and does not change the text of the PREA Standards. The argument ignores the Memorandum's effects and cannot be squared with binding case law.

*First*, Defendants contend the Memorandum is "nothing more than an internal guidance document that does not carry the 'force and effect of law.'" (Defs.' Opp'n at 11 (quoting *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015)).) But internal guidance documents, unlike the Memorandum, do not impose any mandatory obligation or prohibition, or require inspectors to reach any particular result. *See Flight Attendants-CWA*, 785 F.3d at 717. In *Flight Attendants-CWA*, the Federal Aviation Administration's guidance merely identified general concerns that airline policies "should address" and stated that airline policy revisions "may" be necessary. *Id.* at 717–18. The guidance left inspectors free to consider the facts of each case and airlines free to retain any policy permissible under existing regulations. *Id.* at 717–19. Language like "may" and "should" in the guidance supported the court's determination that airlines were "free to ignore" the notice and that it neither limited inspector discretion nor conflicted with existing regulations. *Id.* at 714, 717–19.

The Memorandum does the opposite. It does not merely advise PREA auditors about factors they may consider when evaluating compliance. It prohibits auditors from making compliance decisions altogether, contrary to their regulatory duties. (*See* Mem. at 2–4; 28 C.F.R. §§ 115.403(c), 115.404.) Since "[a]gency action that . . . imposes new obligations on regulated parties or narrowly limits administrative discretion constitutes a legislative rule," the Memorandum constitutes a legislative rule (i.e., final agency action)—not a nonbinding policy statement. *Flight Attendants-CWA*, 785 F.3d at 717. In short, "a document that reads like an edict is likely to be binding, while one riddled with caveats is not." *Id.* Because the Memorandum is a binding directive that conflicts with existing regulations, it constitutes final agency action.

*Second*, Defendants' assertion that the Memorandum lacks legal consequences for external parties and that auditors cannot change conditions within correctional facilities misses the point.

(Defs.' Opp'n at 1, 8.) The focus of the "finality" inquiry is on the agency's decision, not the conduct of third parties affected by the agency's decision. Said differently, all that is required is that the agency take action that alters the regulatory process through which compliance is assessed and enforced. *See, e.g.*, *Env't Def. Fund*, 713 F.2d at 818 (holding that agency action was reviewable final agency action because, although the decision did not expressly state it suspended existing regulatory requirements, it had that effect). The Memorandum forecloses adverse findings and corrective action for the affected PREA Standards, thereby eliminating the consequences that otherwise follow from noncompliance. (*See* Mem. at 2–4.)

Defendants' attempt to distinguish *Clean Air Council* by arguing that the Memorandum "does not stay, change or suspend the effectiveness of the PREA Standards" is untethered from the text of the Memorandum. (*See* Defs.' Opp'n at 13.) Defendants cannot avoid judicial review by conveniently leaving the PREA Standards on the books after issuing a Memorandum declaring that those very same standards are binding no more. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019) (courts look to "the contents of the agency's action, not the agency's self-serving label, when deciding whether statutory notice-and-comment demands apply").[5]

For example, in *Clean Air Council*, the Environmental Protection Agency's stay of compliance deadlines was final because it relieved regulated parties of compliance obligations and of the penalties that attached to noncompliance. 862 F.3d at 7–8. The Memorandum does the same thing in the only forum in which PREA compliance is ever adjudicated. It states that facilities "shall not be held to" the affected Standards and requires that auditors advise facilities to

[5] Indeed, in a decision Defendants themselves cite, (*see* Defs.' Opp'n at 12), the Supreme Court has treated the termination of a program by memorandum as final agency action without pausing to ask whether the memorandum altered the text of any regulation, *see Biden v. Texas*, 597 U.S. 785, 807–09 (2022) (finding memoranda terminating the Migrant Protection Protocols were final agency action).

"disregard" them. (Mem. at 2–3.) It forecloses concrete consequences the regulations attach to noncompliance—an adverse audit finding and mandatory corrective action. 28 C.F.R. §§ 115.403(c), 115.404. And for state facilities, it relieves States of the funding penalty that Congress tied to audit-based certification of compliance, 34 U.S.C. § 30307(e)(2)—the same kind of relief that made EPA's stay final in *Clean Air Council*. Defendants themselves concede that the Memorandum "directs auditors to mark certain PREA standards in their reports as 'Not applicable,'" (Defs.' Opp'n at 13), and "implement[s] changes to . . . the Audit Instrument" (*id.* at 15)—the very instrument that 28 C.F.R. § 115.401(d) requires DOJ to issue to govern the "contents of the audit." A change to the legal instrument that determines the compliance standards applied to a facility is a legal consequence. As in *Clean Air Council*, the result is the indefinite suspension of legal procedures designed to ensure compliance, which is "tantamount to amending or revoking a rule." 862 F.3d at 6.

Defendants' position also runs headlong into *Accardi*, 347 U.S. at 267–68. If, as Defendants insist, the affected PREA Standards remain fully operative, then Defendants have directed PREA auditors *not* to make the findings required by 28 C.F.R. § 115.403(c) and *not* to pursue corrective action that is required under § 115.404. (*See* Pl.'s SUMF ¶¶ 12, 14.) An agency cannot maintain that its regulations remain in force while directing those charged with implementing them not to follow those regulations. *See Accardi*, 347 U.S. at 267–68. The Memorandum thus violates the bedrock principle that an agency "may not . . . simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Finally, Defendants' own account of the Memorandum confirms its finality. By Defendants' description, the Memorandum seeks to effectuate the desired changes to the PREA Standards during the time period that DOJ is working to "updat[e]" those regulations. (*See* Defs.'

Opp'n at 5.) In other words, Defendants know what is legally required—amending the PREA regulations through notice-and-comment rulemaking—and the Memorandum is an interim directive to achieve that precise goal. (*See* Pl.'s SUMF ¶¶ 8–16.) This is precisely what the APA prohibits. Agencies cannot unilaterally demand via Memorandum the same regulatory result they admit requires forthcoming rulemaking.

The D.C. Circuit dealt with a similar argument in *General Electric Co. v. Environmental Protection Agency*, 290 F.3d 377 (D.C. Cir. 2002), where the EPA issued a "guidance document" that imposed binding risk-assessment requirements on regulated parties, which the agency conceded were never subjected to notice-and-comment rulemaking. *Id.* at 378–79. The Court rejected the EPA's argument that the guidance was non-final because the agency planned to revise it in the future, explaining that "[i]f the possibility (indeed, the probability) of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule . . . would ever be final as a matter of law," and ultimately vacated the guidance. *Id.* at 380, 385. The fact that Defendants contemplate future rulemaking to formalize the Memorandum's directives does not render those directives any less final or insulate them from judicial review. *See, e.g.*, *id.*

In short, the Memorandum marks the consummation of DOJ's decision-making, determines the obligations of auditors and facilities, and produces immediate legal consequences throughout PREA's audit and compliance system. It is thus final agency action subject to review under the APA.

## III. THE MEMORANDUM IS REVIEWABLE BY THIS COURT

Defendants argue the Memorandum is unreviewable because it concerns issues "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2), principally relying on *Heckler v. Chaney*, 470 U.S. 821 (1985). That reliance is misplaced. Although DOJ had discretion when developing

and promulgating the PREA Standards through notice-and-comment rulemaking, once promulgated, those Standards became binding on DOJ unless and until amended or repealed through the same process. *See* 34 U.S.C. § 30307(a); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("[T]he APA [] mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."). The Memorandum's directive that auditors disregard some of the PREA Standards duly promulgated therefore was not an exercise of enforcement discretion, and neither *Chaney* nor Defendants' other authorities—which bear no resemblance to the agency action at issue here—support treating it as such.

As a threshold matter, Section 701(a)(2) does not answer a procedural claim. Whether an agency has discretion over the substance of a decision is a different question from whether the agency must follow the APA's procedures when it acts by rule. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Court held that the agency's allocation of lump-sum funds was committed to agency discretion, *id.* at 192–93, and then separately asked whether that decision nonetheless had to be made through notice and comment, *id.* at 195–99. *Chaney* concerns individual enforcement decisions; it says nothing about whether a general directive suspending duly promulgated regulations is a legislative rule. If the Memorandum is a legislative rule—as Part II demonstrates—the notice-and-comment requirement applies regardless of how much discretion DOJ retains over the eventual content of its regulations. *Perez*, 575 U.S. at 101.

Defendants' reliance on *Chaney* also cannot be reconciled with their standing argument. To defeat standing, Defendants insist that audits are inconsequential: auditors "merely inspect facilities and write reports" and have "no authority to change anything in a facility." (Defs.' Opp'n at 1, 9.) To defeat review, Defendants insist that the same audits are "enforcement" whose prioritization is committed to prosecutorial discretion. (*Id.* at 15–17.) The inconsistency in these

two positions is fatal to Defendants' argument. If audits are not enforcement, *Chaney* has no application. If they are, then suspending them for an entire category of regulations is a legal consequence sufficient for finality and an injury sufficient for standing.

In addition, *Chaney* bears no resemblance to this case. In *Chaney*, the Supreme Court addressed whether the Food and Drug Administration's decision "not to exercise its enforcement authority over the use of drugs in interstate commerce may be judicially reviewed." *Chaney*, 470 U.S. at 828. Specifically, the FDA refused petitioners' request that it take specific investigatory and enforcement actions to prevent the use of certain drugs for execution in death-penalty cases. *Id.* at 824. The Court found the FDA's refusal to take the requested actions was not judicially reviewable, comparing the agency's inaction to "the decision of a prosecutor . . . not to indict" and other enforcement decisions that "often involve[] a complicated balancing of a number of factors which are peculiarly within [an agency's] expertise." *Id.* at 831–32. The Court explained that the FDA had no legal duty to take those actions. *Id.* at 835. The statute at issue merely "*authorized*" the agency to conduct "examinations and investigations"; gave "no indication when an injunction should be sought"; and charged the agency "only with recommending prosecution." *Id.* "The Act's enforcement provisions thus commit[ted] complete discretion to the [agency] to decide how and when they should be exercised." *Id.*; *see also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1032 (D.C. Cir. 2007) ("*Chaney's* presumption of non-reviewability only applies where the governing statute's enforcement provision describes the agency's role as discretionary."). The FDA's implementation of the statute also did not give rise to any enforcement obligation. *Chaney*, 470 U.S. at 836.

Here, unlike in *Chaney*, Defendants have not declined to exercise discretionary enforcement authority in response to an individual complaint. They instead attempt to unilaterally

and categorically revoke binding PREA Standards, in violation of the APA's procedural requirements, because of a conflict with the Gender Ideology Order. The PREA Standards are mandated by law, 34 U.S.C. § 30307(a)(1), and Congress intended a comprehensive audit process to evaluate compliance, *id.* § 30307(e)(2)(B), (e)(2)(F), (e)(3), (e)(8). Defendants' own regulations require that auditors evaluate compliance with respect to "each PREA standard" and initiate corrective action if a facility fails to comply with even "one" standard. 28 C.F.R. §§ 115.403(c), 115.404(a). These laws "clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power" such that "review [is] available." *Chaney*, 470 U.S. at 834. And Defendants have effectively abdicated their legal duties by adopting a general policy that categorically excludes the identified Standards from otherwise mandatory audits and corrective actions. *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc) (reviewing agency's general policy of nonenforcement); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676–77 (D.C. Cir. 1994) (distinguishing unreviewable "*single-shot* non-enforcement decision[s]" from "an agency's statement of a *general enforcement policy*," which "may be reviewable for legal sufficiency" where the agency has articulated it in "some form of universal policy statement"). The Memorandum thus cannot be characterized as an enforcement decision "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and it is subject to judicial review under the APA.

Defendants' other authorities similarly fail to support their contention that the Memorandum is not reviewable final agency action. For example, the EPA agreements at issue in *Association of Irritated Residents v. EPA*, 494 F.3d 1027 (D.C. Cir. 2007), merely deferred enforcement subject to conditions designed to produce eventual compliance, and they made no definitive statement of generally applicable enforcement or interpretive practice. *Id.* at 1033–34,

1037. Here, the Memorandum directs all DOJ-certified PREA auditors to "immediately pause" compliance determinations for specified standards "until further notice" due to a "conflict" between binding regulations and the Gender Ideology Order. (*See* Mem. at 2.) It is a prospective, systemwide instruction requiring auditors to disregard existing regulations, not a case-specific agreement that defers enforcement while regulated entities work toward eventual compliance.

Moreover, Defendants' suggestion that the PREA audit process is irrelevant and carries no legal consequences defies both the statutory text and common sense. Congress created the PREA audit framework, mandated that all covered facilities be audited at least once every three years, tied federal funding for state facilities to compliance certifications supported by completed audit reports, and authorized DOJ to decertify non-compliant auditors. *See* 34 U.S.C. § 30307(e)(2), (8); 28 C.F.R. §§ 115.401(a), 115.501(a). It strains credulity to suggest that Congress built this elaborate enforcement architecture—and that DOJ promulgated detailed implementing regulations—for a process that Defendants now claim has no legal significance. That PREA itself creates no private right of action (Defs.' Opp'n at 16) does not grant enforcement discretion to Defendants or alter their legal duty to comply with their own regulations. If anything, the absence of private enforcement makes the mandatory audit process more legally significant, not less: it is the only mechanism through which the Standards are enforced at all—not one of many avenues through which compliance may be achieved.

Nor does *United States v. Texas*, 599 U.S. 670 (2023), help Defendants. That case applied a general "principle of enforcement discretion over arrests and prosecutions" to the Executive's decision to prioritize certain immigration enforcement actions, *id.* at 678, as distinct from cases in which the Executive has "wholly abandoned" its statutory responsibilities or in which the challenged policy involves "the provision of legal benefits or legal status," *id.* at 671, 682–83.

Audits are not comparable to arrests or prosecutions, and a categorical directive never to assess compliance with a class of regulations is not a prioritization of scarce enforcement resources.

Defendants' reliance on *Baltimore Gas & Electric Co. v. FERC*, 252 F.3d 456 (D.C. Cir. 2001) is likewise inapposite. Defendants quote the court's reference to "absolute discretion" while omitting its express qualification that *Chaney* creates "only a presumption, not a categorical rule." *Id.* at 459–60. There, the court presumed that FERC's decision not to pursue an enforcement action was committed to agency discretion because the Natural Gas Act supplied no enforcement standards and provided only that the agency "may" pursue enforcement in appropriate cases. *Id.* at 460–61. Here, by contrast, the presumption does not apply. The PREA Standards do not grant Defendants discretion to cease assessing compliance with particular Standards or to terminate ongoing corrective action; they mandate both. *See* 28 C.F.R. §§ 115.403(c), 115.404. And the Memorandum exceeds any discretion Defendants retain over the "contents of the audit," *id.* § 115.401(d), because it is a prospective, program-wide directive that is fundamentally at odds with the statutory and regulatory scheme. (*See* Mem. at 1 ("Portions of the PREA Standards are in conflict with the requirements in E.O. 14168"), 2 ("Until these updates are finalized, and further guidance is provided, effective immediately, applicable federal and non-federal correctional facilities shall not be held to subsections of the PREA Standards that may conflict with E.O. 14168.").) Thus, the enforcement-discretion exception is inapplicable, and the Memorandum is reviewable by this Court.

## IV. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HER CLAIMS

Defendants admit that "[a]ny repeal of the PREA regulations would have to go through the notice and comment procedure" and that "DOJ is actively in the process of amending the Standards through notice and comment." (*See* Defs.' Opp'n at 14.) Yet the Memorandum mandates that enforcement of these very PREA Standards be ignored, disregarded, and paused effective

immediately. (*See* Mem. at 2–4.) Defendants dispute that they have suspended the applicable Standards, claiming through attorney argument alone that the Memorandum is a mere "temporary pause." (*See* Defs.' Opp'n at 14.) As explained in Part II, however, there is nothing temporary about what Defendants have done: the Memorandum operates indefinitely "until further notice," and it has already suspended compliance audits and corrective actions for the affected Standards and removed those Standards from the auditing mechanism altogether. Nor is there any evidence in the record supporting Defendants' unfounded claim that the PREA Standards "remain in effect" as a practical matter. (*See, e.g.*, Pl.'s SUMF ¶ 12 (instructing "all PREA auditors" to "immediately pause from making compliance determinations" concerning the identified PREA Regulations, to "advise" correctional facilities "to disregard" those PREA Regulations)); *see also Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) ("Conclusory allegations" or "unsubstantiated speculation" do not create "genuine issues of material fact"). To the contrary, the undisputed record shows that the affected Standards have been stripped from the Online Audit System and Audit Instrument, that pending corrective actions must be terminated, and that BOP has rewritten its own sexual-abuse prevention policy to remove the affected provisions. (Pl.'s SUMF ¶¶ 12–16; Defs.' Resp. to Pl.'s SUMF ¶¶ 12–16; Pl.'s Supp. SUMF ¶ 3; BOP Program Statement 5333.01.)

Regardless, DOJ's unsupported argument as to what the Memorandum does or does not do is immaterial. Courts look to the substance and practical effect of agency action, not the label the agency assigns to it, to determine whether the agency violated the APA. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019). Here, the evidence shows the Memorandum effectively and immediately rescinded duly promulgated PREA Standards without complying with the APA's notice-and-comment requirements. Plaintiff should be granted summary judgment on Count I (procedural APA claim) and Defendants' cross-motion for summary judgment should be denied.

Defendants' related contention—that the Memorandum cannot have rescinded anything because, as Plaintiff herself acknowledged, "a Memorandum cannot repeal validly promulgated federal regulations," (Defs.' Opp'n at 13–14 (citing Mot. at 16))—proves Plaintiff's point. Plaintiff agrees that DOJ lacks the power to suspend the PREA Standards by memorandum. That is why the Memorandum is unlawful, not why it is harmless. The EPA likewise lacked the power to revoke the rule at issue in *Clean Air Council* without notice and comment, yet its stay was "tantamount to amending or revoking a rule," was final agency action, and was vacated. 862 F.3d at 6, 14. An agency that wants the effect of a repeal must use the procedures the APA requires; achieving that effect without them is the violation, and vacatur is the remedy. 5 U.S.C. § 706(2)(D).

With respect to Count II, even assuming Defendants are correct that the Declaratory Judgment Act supplies a remedy rather than an independent cause of action, that observation does not entitle them to judgment. Plaintiff does not invoke the Declaratory Judgment Act as a freestanding source of rights; she seeks a declaration as a form of relief for the APA violation established in Count I. "The APA plainly authorizes the court to grant the declaratory relief sought by the plaintiff." *Russell-Murray Hospice, Inc. v. Sebelius*, 724 F. Supp. 2d 43, 59–60 (D.D.C. 2010) (granting plaintiff's request for declaratory relief that various regulations be declared "unlawful and set aside"). Although a standalone declaratory judgment claim does not independently confer federal subject-matter jurisdiction, declaratory relief is proper where the plaintiff asserts a "cognizable cause of action" that provides a "basis upon which to seek declaratory relief." *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011); *see also Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1367 (D.C. Cir. 2023) (affirming summary judgment decision on declaratory judgment claim).

Here, Plaintiff has proven a procedural APA violation, and as a result, the Court must "hold unlawful and set aside [the] agency action." 5 U.S.C. § 706(2); *see also, e.g.*, *Amica Ctr. for Immigr. Rts. v. Exec. Off. for Immigr. Rev.*, 822 F. Supp. 3d 119, 167–68 (D.D.C. 2026) (declaring the defective portions of an interim final rule invalid); *Russell-Murray Hospice*, 724 F. Supp. 2d at 45 (granting plaintiff's motion for summary judgment on its APA challenge to a Department of Health and Human Services demand, which sought an "order declaring that the regulation is unlawful and enjoining HHS from enforcing it").

Because no genuine dispute of material fact exists as to Count II, and Defendants have identified no legal basis for denying Plaintiff summary judgment on that claim, the Court should grant summary judgment in Plaintiff's favor on both counts and deny Defendants' cross-motion.

## CONCLUSION

For all these reasons, Plaintiff respectfully asks this Court to enter summary judgment in her favor on both counts, deny Defendants' cross-motion for summary judgment in its entirety, issue appropriate declaratory relief, and vacate the Memorandum pursuant to 5 U.S.C. § 706(2)(D).

Dated: September 24, 2026

Respectfully submitted,

*/s/ Natalie Kraner*

Alexander Shalom (NJ055)
Natalie Kraner (NY0304)
Kegan A. Brown (admitted *pro hac vice*)
Amanda K. Cipriano (admitted *pro hac vice*)
Mikayla R. Berliner (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, NJ 07960
(212) 419-5866

Alyssa C. Lareau (D.C. Bar ID 494881)
**WARDENSKI P.C.**
300 New Jersey Avenue NW, Suite 300
Washington, D.C. 20001
(202) 935-4224

Sarah Austin (ME0007)
**GLBTQ LEGAL ADVOCATES & DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350

Amy Whelan (*D.D.C. admission pending*)
**NATIONAL CENTER FOR LGBTQ RIGHTS**
1401 21st Street #11548
Sacramento, CA 95811
(415) 365-1338

*Attorneys for Plaintiff Paulina Poe*